In the

# United States Court of Appeals

## for the Seventh Circuit

———————————

Nos. 23-2494 & 23-2519

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICK P. COLEY & DAVID K. DUGGAR,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 1:21-cr-00193-007, -011 — **James P. Hanlon**, *Judge.*

———————————

ARGUED OCTOBER 31, 2024 — DECIDED MAY 15, 2025

———————————

Before SYKES, *Chief Judge*, and RIPPLE and LEE, *Circuit Judges*.

SYKES, *Chief Judge*. A jury convicted Rick Coley and David Duggar on drug and firearm charges stemming from their participation in an Indianapolis drug-trafficking conspiracy led by Jason Betts. They challenge their conspiracy convictions, arguing that they had only buyer-seller relationships with Betts, not conspiratorial agreements. Coley also challenges the sufficiency of the evidence on his firearm

conviction, and both defendants challenge the denial of their joint motion to sever the drug-trafficking counts from the firearms counts.

We reject these arguments and affirm. The evidence at trial established that Coley and Duggar repeatedly purchased distribution quantities of drugs from Betts and his operatives. As we recently held in *United States v. Page*, 123 F.4th 851 (7th Cir. 2024) (en banc), that is enough to support a drug conspiracy conviction. The evidence also supports Coley's firearm conviction based on a theory of constructive possession: the gun in question was found in his bedroom at the time of his arrest, alongside his personal items and drug-dealing implements. Finally, the drug-trafficking and firearm counts were properly joined, and the judge did not abuse his discretion in denying the severance motion.

## I. Background

From late 2018 until he was arrested in July 2021, Jason Betts ran a large methamphetamine and fentanyl distribution ring in Indianapolis. As relevant here, Betts regularly supplied Coley and Duggar, who resold the drugs to their own customers. Because Coley and Duggar acted independently of each other and their relationships with Betts differed in some respects, we separately recount the evidence adduced against them at trial.

### A. Coley

At the end of 2018, Betts began supplying distribution quantities of methamphetamine to Christina Pennington and her boyfriend Shaune Smith after meeting them through a family member of his. As business picked up for Pennington and Smith, so too did their drug orders from Betts. By July

2019, they were receiving about five pounds of meth every week or so, and by September, Betts was also supplying them with fentanyl. Pennington and Smith in turn distributed the drugs to others, including Coley, for resale to customers.

Pennington recruited Coley into the distribution network about a year after she and Smith began purchasing drugs from Betts. Starting in about December 2019, Coley purchased meth and fentanyl from Pennington and Smith at least every couple of days, mostly on credit. Depending on customer demand, Coley procured about an ounce or two of meth and anywhere from a couple grams to an ounce of fentanyl during any given transaction. Throughout this period Coley shared customers with Pennington and Smith, sometimes accompanying them to drug sales—and Smith described Coley as a "business partner" in a text message to him.

This arrangement continued for about three months, until early March 2020 when Pennington and Smith were arrested for drug possession. At the time of their arrest, the couple owed Betts about $22,000 for fronted drugs. After learning that Coley owed money to Smith, Betts called him via Facebook Messenger to discuss payment of the debt. Coley ultimately agreed to pay Betts the value of the debt he owed to Smith in exchange for drugs from Betts.

Across three transactions over the following week and a half, Betts fronted Coley about one and a half pounds of meth and three ounces of fentanyl. On March 12, 2020, shortly after the third transaction, Indianapolis police arrested Coley in his motel room, seizing the meth that he had acquired from Betts as well as two handguns and $2,530 in cash.

Coley was released a few months later and almost immediately informed Betts that he was ready to sell drugs again. Despite concerns that Coley might have become a government informant, Betts agreed to resume their drug-distribution relationship.

After an initial transaction involving small amounts of fentanyl and meth, Betts supplied Coley with a few hundred grams of fentanyl every two weeks and continued to do so from the late fall of 2020 until July 2021. Betts advised Coley on how to distribute the fentanyl, urging him not to sell on credit to particular customers and suggesting that Coley have someone else answer customer phone calls when he was ill or unable to do so. And because Betts was concerned about the risks of dealing drugs from hotels, he also helped Coley find a place to live, though Coley relocated to another residence shortly after moving in.

Meanwhile, in January 2021 Pennington began cooperating with federal law enforcement, identifying Betts as her drug source and describing his arrangement with Coley. Based on her information, federal agents obtained several court orders authorizing wiretaps of Betts and others in his orbit.

On July 14, 2021, law-enforcement officers arrested Coley at the three-bedroom house that he then shared with several roommates. Coley wasn't wearing a shirt or shoes when he was arrested, so he pointed the officers to his bedroom and asked them to bring him a shirt and sandals from his bedroom closet. While retrieving those items, the officers discovered a digital scale and blender in a nightstand next to the bed, both of which contained drug residue. They also found a loaded shotgun behind Coley's bedroom door.

## B. Duggar

Betts met Duggar through a friend who was part of his drug-trafficking ring. From at least October 2020 until May 6, 2021, Duggar bought meth from Betts every day or two, typically between four and eight ounces but sometimes up to a pound each time. Unlike Coley, Duggar paid for the meth in cash because Betts did not trust Duggar enough to sell to him on credit. Duggar then sold the meth to his own customers. Whenever Duggar collected enough money from his customers, he sought more meth from Betts. Likewise, Betts informed Duggar whenever he had more meth available, explaining that as long as Duggar kept paying, he would continue to supply him with drugs.

Duggar and Betts did not have an exclusive arrangement, however. Duggar had another supplier whom he called his "main guy." Neither Betts nor Duggar knew the identity of each other's customers, and Betts never instructed Duggar on how to distribute the meth. They did, however, discuss certain matters relevant to their drug-dealing relationship. For example, Betts reprimanded Duggar when he was late or missed a meeting, and on one occasion warned him about the presence of the police, postponing a planned transaction until later in the day. Duggar also sought Betts's assistance in dealing with two customers who owed him money; the latter offered to help but nothing ever came of it.

Duggar was arrested in his hotel room on July 14—the same day as Coley's arrest—as part of the federal investigation of Betts's drug-trafficking operation. Officers found meth, digital scales, plastic baggies, and two rifles in Duggar's hotel room.

## C. Trial and Conviction

The government eventually indicted Betts and 19 others—including Coley and Duggar—based on evidence gathered during the investigation of Betts's drug-trafficking network. Coley and Duggar were charged with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; possession of meth (Duggar) and fentanyl (Coley) with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).[1] Betts and the other defendants pleaded guilty.

The case against Coley and Duggar proceeded to trial. The defendants jointly moved to sever the drug-trafficking counts from the firearms counts, arguing that the charges were improperly joined under Rule 8(a) of the Federal Rules of Criminal Procedure, and alternatively, that severance was warranted under Rule 14. More specifically, they maintained that the drug and firearm charges lacked a common factual basis and that the evidence relevant to the firearm counts—specifically their criminal histories—would not be admissible in a trial featuring only the drug-trafficking counts. The district judge denied the motion, noting that the firearms in question were found in each defendant's room along with

---

[1] The government also charged Coley with receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n). His conviction on this count was later vacated and merged with the § 922(g)(1) conviction because it was based on the same conduct. *See United States v. Parker*, 508 F.3d 434, 440 (7th Cir. 2007) ("Although the government is free to pursue multiple theories of violation at trial, only one conviction may result under § 922(g) for a single incident of possession, even though the defendant may belong to more than one disqualified class." (citation omitted)).

evidence of their ongoing drug trafficking, and that the evidence on the drug and firearm charges overlapped.

At trial the government introduced numerous incriminating phone calls, text messages, and testimony from key coconspirators—including Betts himself. At the close of the government's case, Coley and Duggar moved for judgment of acquittal on all counts. The judge reserved his ruling and later agreed to give the jury a buyer-seller instruction.[2] The jury found Coley and Duggar guilty on all counts. The judge then denied their motions for acquittal and sentenced Coley and Duggar to 360 and 276 months in prison, respectively.

## II. Discussion

Coley and Duggar argue that the government failed to present sufficient evidence to convict them of conspiracy. Coley also challenges his firearm conviction on the same

---

[2] The instruction stated:

> [A] conspiracy requires more than just a buyer-seller relationship between a defendant and another person. In addition, a buyer and seller of methamphetamine or fentanyl do not enter into a conspiracy to possess methamphetamine or fentanyl with intent to distribute methamphetamine or fentanyl simply because the buyer resells the methamphetamine or fentanyl to others, even if the seller knows that the buyer intends to resell the methamphetamine or fentanyl. The [g]overnment must prove that the buyer and seller had the joint criminal objective of further distributing methamphetamine or fentanyl to others. A routine buyer-seller relationship, without more, is not sufficient to prove conspiracy.

ground. And both defendants challenge the denial of the severance motion.

## A. Sufficiency of the Evidence

A challenge to the sufficiency of the evidence to sustain a conviction faces a demanding standard of review: we give great deference to the jury's verdict, viewing the trial evidence in the light most favorable to the verdict and drawing all reasonable inferences in the government's favor. *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020). To prevail, the defendant must show that no rational jury could have found him guilty beyond a reasonable doubt. *See United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). We have characterized this burden as "heavy, indeed, nearly insurmountable." *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016) (internal quotation marks omitted).

### 1. Conspiracy convictions

"To convict a defendant of conspiracy, the government must prove[:] (1) two or more people agreed to commit an unlawful act[;] and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Wright*, 85 F.4th 851, 861 (7th Cir. 2023) (internal quotation marks omitted). For drug conspiracies, this requires sufficient evidence that "the defendant knowingly agreed, perhaps implicitly, with someone else to distribute drugs." *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924–25 (7th Cir. 2022) (internal quotation marks omitted). "Evidence showing only that two people are in a buyer-seller relationship is insufficient to prove a drug-distribution conspiracy." *Id.* at 925.

Coley and Duggar argue that the government proved only that they had buyer-seller relationships with Betts, not conspiratorial agreements. On this record, their argument is foreclosed by our recent en banc decision in *United States v. Page*, 123 F.4th 851 (7th Cir. 2024), issued shortly after this appeal was argued. Our circuit precedent had previously held that evidence of repeated, distribution-quantity drug transactions was insufficient, without more, to sustain a drug-conspiracy conviction, but *Page* overruled that line of cases. *Id*. at 861–63.

We explained in *Page* that our circuit's conspiracy and buyer-seller jurisprudence had long ago deviated from the Supreme Court's decision in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), the foundational case on the buyer-seller doctrine in drug-conspiracy law. *Id.* at 859–61. In *Direct Sales*, the Supreme Court affirmed a conspiracy conviction against a registered drug manufacturer based solely on its repeated sales of "illegally vast quantities of morphine sulphate" to a doctor who subsequently distributed the drugs to others. 319 U.S. at 704–07, 714–15. As we noted in *Page*, the illegality of the drug transactions in *Direct Sales* "proved critical to sustaining [the] conspiracy conviction" because "[t]here is an inherent and necessary trust between parties to an illegal transaction … that is not shared by buyers and sellers of innocuous items." *Page*, 123 F.4th at 859–60.

In a series of cases starting with *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008), our circuit had missed the distinction drawn in *Direct Sales* between proof of repeated, distribution-quantity sales of illicit drugs, which alone is sufficient to sustain a conspiracy conviction, and proof of "repeated, distribution-quantity sales of *innocuous* goods between a

buyer and seller," which is not. *Page*, 123 F.4th at 861 (emphasis added).

We went on in *Page* to reset our circuit's drug-conspiracy law on the foundation established in *Direct Sales*, explaining that when a seller of illegal drugs repeatedly sells distribution quantities to a buyer with the knowledge that the buyer intends to illegally distribute the drugs to others, the buyer and seller "develop … a codependent business relationship wherein they have a shared stake in each other's success." *Id.* at 860. Based on the "mutually known benefits that flow from [their] transactions," we explained that "evidence of repeated, distribution-quantity transactions … shows that the buyer and seller knowingly and intentionally entered into an implicit agreement to distribute drugs." *Id.* On this reasoning, and consistent with the Supreme Court's decision in *Direct Sales*, we held that evidence of "repeated, distribution-quantity drug transactions alone can sustain a conspiracy conviction." *Id.* at 856–57.

In light of *Page*, the government's evidence against Coley and Duggar was easily sufficient to sustain the jury's guilty verdicts on the conspiracy counts. Betts testified that he repeatedly sold Coley and Duggar distribution quantities of drugs: for Coley, hundreds of grams of fentanyl every two weeks from fall 2020 until July 14, 2021; and for Duggar, at least four ounces of meth at least once each week from October 2020 until May 6, 2021. That's enough for a rational jury to conclude that each defendant entered into an agreement with Betts, at least implicitly, to distribute drugs.

Coley and Duggar argue that Betts's testimony is biased, compromised, or otherwise unreliable. "But evaluating the credibility of [a] witness[] is the jury's job," *United States v.*

*Cruse*, 805 F.3d 795, 812 (7th Cir. 2015), and "[a] finder of fact is entitled to believe the testimony of even the most dishonest of witnesses," *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017). We will not find a witness incredible as a matter of law except in "extreme situations"—for example, where "it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all." *Id.* (internal quotation marks omitted). Betts's testimony was not incredible under this standard.

### 2. *Coley's firearm conviction*

The jury found Coley guilty of violating § 922(g)(1) based on his possession of the loaded shotgun found behind his bedroom door. A § 922(g)(1) conviction requires proof of four elements: (1) the defendant was convicted of a felony; (2) the defendant knowingly possessed a firearm; (3) the defendant knew he was a felon; and (4) the gun possessed by the defendant had been in or affected interstate commerce. *United States v. Price*, 28 F.4th 739, 752–53 (7th Cir. 2022). Coley challenges only the second element.

The government relied on the concept of constructive possession, a legal theory "whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (internal quotation marks omitted). Proximity together with evidence showing a connection between the defendant and the gun is sufficient to establish constructive possession. *Price*, 28 F.4th at 753. We have repeatedly held that such a connection exists where a gun is "found in areas over which the defendant exercised control, such as a bedroom." *United States v. Thomas*,

321 F.3d 627, 636 (7th Cir. 2003); *see, e.g.*, *United States v. Alanis*, 265 F.3d 576, 582, 592 (7th Cir. 2001) (bedside nightstand).

Coley admits that he was in his bedroom on the day of his arrest, when the shotgun was found behind the bedroom door. He protests that nothing else links him to the gun. Viewed in the light most favorable to the verdict, however, the evidence amply supports constructive possession. Coley directed the arresting officers to his bedroom to retrieve clothing and sandals from his closet, demonstrating his authority and control over the bedroom and its contents. His clothing is sufficient physical evidence linking him with the bedroom and other items found there, including the shotgun. *See United States v. Katz*, 582 F.3d 749, 753 (7th Cir. 2009); *cf. United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009) ("The presence of [the defendant's] state identification card, social security card, and mail addressed to him in the master bedroom demonstrated that he was living in the room where the marijuana and crack were found.").

Coley points out that his roommates had access to his bedroom and could have placed the gun behind the door. But no *evidence* supports that theory; regardless, "[c]onstructive possession may be sole or joint." *United States v. Hampton*, 585 F.3d 1033, 1041 (7th Cir. 2009). Coley also criticizes the government for failing to conduct fingerprint or DNA testing of the shotgun. But constructive possession can be proved by direct or circumstantial evidence, *Price*, 28 F.4th at 753, so the absence of fingerprint or DNA evidence is of little consequence. Coley has not carried his burden to show that no rational jury could have found that he possessed the shotgun.

## B. Misjoinder/Severance

A severance claim involves two distinct issues. *United States v. Berg*, 714 F.3d 490, 494 (7th Cir. 2013). "The first is joinder—whether the two sets of charges had enough in common to be tried in the same case. The second is severance—whether, despite being properly joined, the two sets of charges nevertheless should have been tried separately to avoid undue prejudice." *Id.* "Whether joinder was proper is a question of law subject to de novo review." *United States v. Peterson*, 823 F.3d 1113, 1124 (7th Cir. 2016). If charges were properly joined, then we review the denial of a request for severance deferentially, for abuse of discretion. *United States v. Jackson*, 787 F.3d 1153, 1158 (7th Cir. 2015).

Under Rule 8(a) of the Federal Rules of Criminal Procedure, joinder of offenses is permissible if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." In determining whether joinder was proper, "we look solely to the face of the indictment," comparing "the offenses charged for categorical, not evidentiary, similarities." *Berg*, 714 F.3d at 495 (internal quotation marks omitted).

As Coley and Duggar acknowledge, we have long presumed that drug-trafficking and firearm counts are properly joined because "[p]ossession of firearms and drug trafficking are closely related." *United States v. Pigee*, 197 F.3d 879, 891 (7th Cir. 1999). "This presumption arises from the natural inferences that may be drawn from the contemporaneous possession of guns and drugs or drug paraphernalia: the firearm is an indication of drug activity, and participation in drug trafficking supplies a motive for

having the gun." *United States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008) (internal quotation marks omitted). The presumption can be overcome by "a significant temporal disconnect between the alleged offenses." *Id.*; *see, e.g.*, *United States v. Hubbard*, 61 F.3d 1261, 1270–71 (7th Cir. 1995) (concluding that firearms and narcotics charges were misjoined where the firearms were discovered more than 17 months after the defendant's final drug transaction).

There is no temporal disconnect here. But even setting aside the force of the presumption, the drug and firearm charges in this case are plainly part of a common scheme, plan, or series of transactions. The firearms in question were found in the defendants' rooms at the time of their arrests, together with drugs and other implements of their drug-trafficking activity, and during the ongoing drug conspiracy.

So the drug and firearm counts were properly joined. And the district judge did not abuse his discretion in declining to sever them. Under Rule 14, which governs relief from prejudicial joinder, Coley and Duggar bear a heavy burden to demonstrate that the judge's denial of severance prejudiced them. *See United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008). "[I]t is not enough that separate trials may have provided [them] with a better opportunity for acquittal." *United States v. Dixon*, 184 F.3d 643, 645 (7th Cir. 1999) (internal quotation marks omitted). They must instead "establish that the denial of severance actually prejudiced [them] by preventing the jury from arriving at a reliable judgment as to guilt or innocence." *Ervin*, 540 F.3d at 629.

Coley and Duggar have not carried this burden. There is no prejudice if the evidence on the counts the defendant asks to be severed would be admissible in a trial on the remaining

counts. *See United States v. Rollins*, 301 F.3d 511, 519 (7th Cir. 2002). As we've noted, the defendants' participation in drug trafficking is proof of motive for having a gun, *see Blanchard*, 542 F.3d at 1141, which is itself relevant to showing constructive possession when coupled with proximity to the gun, *see Price*, 28 F.4th at 753. That chain of reasoning certainly applies here because Coley and Duggar possessed the firearms in question *during* the drug-trafficking conspiracy, and law-enforcement officers found the guns in their rooms alongside drugs and indicia of drug dealing.

Coley and Duggar nonetheless claim prejudice based on so-called "spillover," arguing that the firearm counts highlighted their criminal backgrounds and may have led jurors to infer that they had criminal dispositions, potentially affecting the jury's consideration of the evidence on the drug-trafficking counts. Speculation about a "spillover" effect doesn't suffice to show actual prejudice. *See Ervin*, 540 F.3d at 629. And any marginal prejudice was cured when the judge instructed the jury to consider all counts separately. *See United States v. Maggard*, 865 F.3d 960, 972 (7th Cir. 2017) ("[A]s the Supreme Court has held, less drastic measures than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993))).

In any event, there is no prejudice where "the evidence against [the defendants] was compelling on all counts." *Berg*, 714 F.3d at 496. That is certainly the case here. Accordingly, the judge was well within his discretion to deny the severance motion.

AFFIRMED