In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1997

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRANCE BRASHER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:15-cr-00028-TWP — **Tanya Walton Pratt**, *Judge.*

ARGUED JANUARY 8, 2020 — DECIDED JUNE 11, 2020

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges*.

ROVNER, *Circuit Judge.* A grand jury charged Terrance
Brasher and 14 other defendants with engaging in a conspiracy
to distribute narcotics in and around the Southern District of
Indiana. *See* 21 U.S.C. §§ 846, 841(a)(1). Only Brasher pro-
ceeded to trial, and after hearing the government's evidence,
a jury found him guilty. The district court ordered him to serve

a term of life in prison. *See* 21 U.S.C. § 841(b)(1)(A) (2016). Brasher appeals, asserting that there was a material variance between the conspiracy as charged and as proven at trial, that the government's proof at trial constructively amended the indictment, that the government improperly exercised its peremptory challenges to exclude two African American venire members during the jury selection process, that the prosecutor made prejudicial remarks in closing argument, that the government made improper use of evidence obtained via court-authorized wiretaps, and that the district court erroneously precluded him from challenging one of the prior narcotics convictions which triggered his mandatory term of life imprisonment. Finding no merit to any of these arguments, we affirm Brasher's conviction and sentence.

## I.

Brasher was one spoke in a large hub-and-spoke narcotics conspiracy centered in Louisville, Kentucky. Defendant Carlos Shelton headed the conspiracy and was therefore at its hub. Terry Martin, an Indiana resident whose Louisville auto supply shop served as the de facto headquarters for the operation, was Shelton's partner in the criminal enterprise, frequently pooling money with Shelton to acquire narcotics. Maycoe Ortiz, who had a mechanic shop in Louisville, Kentucky across the street from Martin's auto shop, became a principal supplier of narcotics for the conspiracy.

It was Martin who introduced Brasher to Shelton. Martin knew Brasher from a previous stint of incarceration. In or about September 2014, Martin supplied Brasher with a small quantity of heroin. Brasher quickly sold the heroin and

returned to Martin asking for more. Martin did not think that he would be able to supply Brasher with the quantities Brasher needed, so he introduced Brasher to Shelton, and Brasher became Shelton's customer.

Shelton distributed narcotics to dealers in both Indiana and Kentucky. Louisville is on the northern Kentucky border, directly across the Ohio river from multiple southern Indiana municipalities, including New Albany and Jeffersonville, that are part of the greater Louisville metropolitan area. Brasher himself lived in Louisville, Kentucky, and distributed drugs there. After joining the conspiracy in the Fall of 2014, he remained a participant until authorities brought it to an end with multiple searches and arrests in December 2015. So far as the trial record reveals, Brasher did not distribute drugs in Indiana, took no conspiracy-related actions in Indiana, and did not interact with any of the Indiana dealer/spokes.

As he did with other dealers, Shelton typically "fronted" heroin, cocaine, and methamphetamine to Brasher and accepted payment from the proceeds of Brasher's subsequent re-sales of the substances. Dealers, whether operating in Indiana or Kentucky, typically came to Louisville to pick up their drugs or drop off their payments for Shelton; occasionally, Shelton would meet a dealer in Indiana. Like other dealers, Brasher often picked up his supply of narcotics at Martin's auto supply shop and dropped off cash to reimburse Shelton at the same location (Shelton had a key to Martin's shop). Brasher was Shelton's most reliable dealer: He moved relatively large quantities of narcotics and paid his debts to Shelton on time. Shelton came to consider Brasher his "number one customer" (R. 888 at 299) and developed "a strong relation-

ship based on trust with [him]" (R. 889 at 481). Brasher also on several occasions supplied kilogram quantities of cocaine to Shelton that he obtained from his own supplier in Texas. On one occasion, a multi-kilogram quantity of cocaine that Brasher had purchased with nearly $100,000 of Shelton's money was lost in shipment when the driver was stopped by police. Such was Shelton's trust in Brasher that he accepted Brasher's account of the incident and continued to do business with him.

A superseding indictment charged that Brasher conspired with Shelton, Martin and others in the Southern District of Indiana and elsewhere to distribute heroin, cocaine, and methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1). As we noted at the outset, every named defendant other than Brasher pleaded guilty. Shelton, Martin, and Ortiz testified for the government at Brasher's trial in January 2018, and at the conclusion of a four-day trial, the jury convicted him of the conspiracy charge. In its verdict, the jury specifically found Brasher responsible for the distribution of 500 grams or more of methamphetamine, at least one kilogram of heroin, and five kilograms or more of cocaine.

Prior to the trial, the government filed two notices of Brasher's prior felony drug convictions pursuant to 21 U.S.C. § 851. The first notice referenced a 2000 conviction for, *inter alia*, drug trafficking, and the second referenced three such convictions in 2013. At sentencing, the district court found that because Brasher had at least two prior felony drug convictions, he was subject to enhanced statutory sentencing provisions which in his case dictated a life term in prison. *See* 21 U.S.C.

§ 841(b)(1)(A) (2016).[1] Based on additional testimony and wire intercepts presented at the sentencing hearing, the district court also found that Brasher was responsible for a murder committed in furtherance of the conspiracy, and that finding resulted in an offense level likewise calling for life imprisonment under the Sentencing Guidelines. In compliance with the statutory mandate, the court ordered Brasher to serve a life term.

## II.

A. *Variance between the indictment and the trial evidence.*

Although the superseding indictment charged a conspiracy to distribute drugs that took place in the Southern District of Indiana and elsewhere, Brasher, as discussed above, appears to have operated in Kentucky exclusively. This leads him to argue that he was not involved in the larger conspiracy encompassing Indiana and that the evidence at most established that he was part of a separate conspiracy to distribute narcotics solely in Kentucky. Consequently, he argues, there was a fatal variance between the conspiracy as charged and the proof at trial, as there was no proof that he participated in a conspiracy to distribute drugs in the Southern District of Indiana.

A conspiracy variance claim is essentially a challenge to the sufficiency of the evidence underlying the conviction, *United States v. Stevenson*, 656 F.3d 747, 752 (7th Cir. 2011) (citing *United States v. Womack*, 496 F.3d 791, 794 (7th Cir. 2007)); and

---

[1] Subsequent to Brasher's sentencing, the statute was amended to eliminate the mandatory life term. *See* P.L. 115-391, 132 Stat. 5194, 5220 (Dec. 21, 2018).

to that extent, we must, of course, examine the evidence in the light most favorable to the government, *id.* If the evidence reveals that there was actually more than one conspiracy, as Brasher contends there was here, we will not find a fatal variance so long as the jury could have found beyond a reasonable doubt that among the multiple conspiracies was the conspiracy charged in the indictment. *Womack*, 496 F.3d at 794 (citing *United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001)); *see also United States v. James*, 540 F.3d 702, 706–07 (7th Cir. 2008).

To sustain its burden of proof on the conspiracy charge, the government was required as a general matter to show that Brasher knowingly joined an agreement to commit a criminal offense. *United States v. Green*, 648 F.3d 569, 579 (7th Cir. 2011); *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010); *United States v. Avila*, 557 F.3d 809, 814 (7th Cir. 2009). More specifically, the government had to prove that Brasher embraced a common criminal objective with Shelton and the other co-conspirators—namely, the distribution of narcotics. *See United States v. Tello*, 687 F.3d 785, 793 (7th Cir. 2012); *Green*, 648 F.3d at 579. But Brasher did not need to know every member of the conspiracy nor did he need to participate in every act of the conspiracy in order to be convicted. *Avila*, 557 F.3d at 814; *James*, 540 F.3d at 707–08. As long as he was aware of the aim of the conspiracy and made a knowing decision to join it, he may be held to account for each act foreseeably committed in furtherance of the conspiracy by another conspirator. *United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002).

As we have noted, this was a classic hub-and-spoke conspiracy in which there were many dealers who served as

spokes, interacting with certain central figures like Shelton at the hub. To qualify as a single conspiracy, a hub-and-spoke operation must have a "rim" connecting the spokes, namely, "an agreement to further a single design or purpose[.]" *Avila*, 557 F.3d at 814 (citing *United States v. Bustamonte*, 493 F.3d 879, 885 (7th Cir. 2007)). Brasher agrees that, as a narcotics dealer, he was a spoke in Shelton's narcotics enterprise, but he contends that there was no such rim uniting him with all of the other dealers Shelton supplied—including in particular the dealers in Indiana—and that consequently this was not one conspiracy but, at a minimum, two conspiracies: one focused on distributing drugs in Kentucky and one doing the same in Southern Indiana.

But especially given Brasher's particular place in the enterprise, the jury readily could have concluded otherwise. Brasher, repeatedly and over a substantial period of time, had the drugs fronted to him and repaid Shelton from the proceeds of his sales, which is one factor signaling that he had more than a mere buyer-seller relationship with Shelton. *See United States v. Hopper*, 934 F.3d 740, 755 (7th Cir. 2019); *United States v. Moreno*, 922 F.3d 787, 794–95 (7th Cir. 2019). And what Brasher was doing in these respects was no different than what other dealers supplied by Shelton were doing, including dealers who operated in Indiana. Indeed, on at least one occasion, Shelton mentioned another dealer to Brasher, explaining that he (Shelton) needed to reserve a couple of ounces for that individual from a supply of cocaine he was otherwise making available to Brasher. R. 888 at 369–70. More than that, Brasher was not only a dealer, but occasionally a supplier to Shelton and thus to the broader enterprise. So Brasher was necessarily

aware of the existence of other dealers and that the enterprise extended beyond his own dealings with Shelton and Martin. *See Avila*, 557 F.3d at 814–15. And given that he was making multi-kilogram purchases of cocaine on Shelton's behalf, he would have had some idea of the scope of the conspiracy; at the same time, his willingness to undertake such purchases demonstrates his agreement to further the overall conspiracy. *Id.* In short, Brasher was not just operating as an isolated dealer in Kentucky. *See James*, 540 F.3d at 707–08.

Moreover, the distinction that Brasher attempts to draw between the Indiana dealers and Kentucky dealers is an artificial one, given the geographic realities of the Louisville metropolitan area. People cross state lines as a matter of routine, particularly in metropolitan areas, like the Louisville metroplex, that straddle a border. As one of the government's witnesses, a Louisville police officer, testified at trial, "[t]here are no boundaries in criminal activity," and consequently it is not uncommon for people to conspire with someone across a river. R. 889 at 742. Thus, it is no surprise that Shelton was supplying dealers on both sides of the Ohio river, that a conspiracy member like Martin, for example, might live in Indiana but operate a place of business (both legitimate and criminal) in Louisville proper, or that the methamphetamine supplied to conspiracy members, including Brasher, was processed at a house on the Indiana side of the river/border before it was distributed to Brasher and others operating on the Kentucky side of the border. Brasher himself mentioned a trip across the river to Indiana "to grab something for his car," in one of the intercepted conversations introduced at trial (R. 889 at 455); and although the record does not disclose whether that

trip was in any way related to the conspiracy, it illustrates the larger point that people living on the Kentucky side of the river do not necessarily remain there at all times. Brasher confined his trafficking activities to Kentucky, but it would have been reasonably foreseeable to him that other members of the conspiracy might be trafficking narcotics in Indiana and/or traveling to Indiana for conspiracy-related purposes. Indeed, it is not at all unusual for conspiracies to cross state and judicial district lines; hence, the law recognizes that such crimes may be prosecuted in any district where one's co-conspirators have acted in furtherance of the conspiracy. *See* 18 U.S.C. § 3237(a) (venue for offenses, *inter alia*, committed in more than one district may be prosecuted in any district in which the offense was begun, continued, or completed); *Hyde v. United States*, 225 U.S. 347, 356–67, 32 S. Ct. 793, 798–802 (1912) (conspirators could be tried in forum district based on overt acts taken by unindicted co-conspirator in that district, which rendered defendants constructively present in that district); *United States v. Wren*, 363 F.3d 654, 660 (7th Cir. 2004) (venue proper in any district wherever one overt act in furtherance of the conspiracy was committed) (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 119 S. Ct. 1239 (1999)), *j. vacated on other grounds*, 543 U.S. 1101, 125 S. Ct. 1021 (2005). Apart from whether various co-conspirators were operating in Indiana or across the river in Louisville, there was nothing distinguishing the nature of their activities or dividing them from other conspirators. This was a single conspiracy engaging in a common aim of distributing heroin, cocaine, and metham-phetamine in the greater Louisville area, and it would have come as no surprise to Brasher that some dealers were traffick-

ing on the Indiana side of the river. As a conspirator, Brasher may be said to have conspired with those dealers operating in Indiana even if he never set foot there on conspiracy business.

For these reasons, the evidence was sufficient to establish Brasher's knowing participation in the conspiracy as charged, one reaching into the Southern District of Indiana. There was no fatal variance between the proof at trial and the conspiracy alleged in the superseding indictment.

B. *Constructive amendment of the indictment*.

In what is largely a reprise of his variance argument, Brasher also contends that the evidence at trial constructively amended the indictment by establishing a conspiracy different from the one charged, thus inviting the jury to convict him for an offense outside the scope of the indictment returned by the grand jury. *See United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998). Because Brasher first raised this issue in a post-trial motion, our review is for plain error only. *United States v. Hughes*, 213 F.3d 323, 328 & nn. 7–8 (7th Cir.), *j. vacated on other grounds*, 531 U.S. 975, 121 S. Ct. 423 (2000). Judge Pratt rejected Brasher's argument for the same reasons she found the evidence sufficient to sustain Brasher's conviction for conspiracy, and she was correct to do so.

As discussed above, the evidence readily supports the notion that Brasher, as charged, conspired with the other defendants to distribute drugs in the Louisville metropolitan area, including those portions of the metropolitan areas on the Indiana side of the Ohio river. Any error in that regard surely was not plain.

C. *Batson claim*.

Brasher renews his contention that the government exercised its peremptory challenges on the basis of race to strike two of the three African American members of the venire, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), with the result that his jury included only one African American juror. Brasher did not raise his *Batson* claim until after the jury was seated and sworn and the venire dismissed, which, as he concedes, was late. *See United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016) ("the dismissal of the venire or the swearing of the jury is the presumptive deadline for making *Batson* challenges"). The district judge nonetheless chose to treat the claim as preserved and, after a brief hearing, rejected the claim on its merits. We therefore treat the claim as preserved as well, and review the trial court's ruling for clear error. *United States v. Yarrington*, 640 F.3d 772, 778 (7th Cir. 2011) (citing *United States v. McMath*, 559 F.3d 657, 663 (7th Cir. 2009)).

*Batson* calls for a three-step process when the defendant charges that the prosecution has improperly exercised its peremptory challenges based on race: (1) the defendant makes a prima facie case that race was a factor in the government's exercise of its peremptory challenges; (2) the prosecution offers a race-neutral reason for the challenge(s) in question; and (3) the court considers whether the prosecution's stated non-discriminatory rationale is pretextual. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476–77, 128 S. Ct. 1203, 1207 (2008)). The parties' dispute in this case focuses on the third step of the process—pretext.

The government explained below that it struck the two
African American venire members, Ms. W. and Mr. H., because
Ms. W.'s brother had been charged (and acquitted) of a drug
offense, and Mr. H. had been convicted of a misdemeanor drug
offense. There is no question that this is a valid, non-discrimi-
natory rationale for striking prospective jurors. *See United
States v. Lampkins*, 47 F.3d 175, 178 (7th Cir. 1995) ("a prosecu-
tor may permissibly strike a prospective juror on the grounds
that close friends or relatives have been convicted of the very
crime at issue") (collecting cases). But Brasher argued that this
non-discriminatory rationale was pretextual, in view of the fact
that the government had not used one of its remaining pe-
remptory challenges to strike Mr. M., whose brother had been
convicted of a narcotics trafficking offense. In reply, the
government acknowledged that it had accepted Mr. M., but
pointed out that it had also used a peremptory challenge to
excuse another white juror, Mr. K., who also had a brother who
had pleaded guilty to and was at that time incarcerated for a
drug offense.

Weighing the parties' submissions, the district court
credited the government's explanation for its strikes and
rejected Brasher's *Batson* challenge:

> [T]here's no evidence before the Court, or no
> argument even, that the exclusions were race
> based, so the Court is going to find that the
> government's explanations are acceptable
> and that they—the government's offered
> nondiscriminatory reasons for striking both
> Ms. [W.] and Mr. [H.].

R. 887 at 24. The court reiterated its finding when it denied Brasher's subsequent motion for a new trial, describing the government's reasons for striking the two African American venire members and one white venire member as "non-discriminatory, reasonable, and credible, considering the charges before the jury." R. 828 at 13.

Brasher contends that the district court's finding was clearly erroneous, given that the government did not use its proffered rationale to excuse Mr. M. Indeed, in crediting the government's explanation for striking Ms. W. and Mr. H., the court did not explicitly address the government's failure to strike Mr. M and reconcile it with the government's proffered rationale for striking the African American jurors.

Before we entertain the merits of the district court's ruling, we must first consider whether the court committed a procedural error in its handling of the *Batson* claim. Our two published opinions in the *Taylor* case make clear that in addressing the strikes of multiple prospective jurors, a district court must take care to analyze each such juror individually, and in particular to evaluate the plausibility and credibility of the government's proffered rationale for each strike in light of the individual juror's characteristics and circumstances. *United States v. Taylor*, 509 F.3d 839 (7th Cir. 2007) ("*Taylor I*"); *United States v. Taylor*, 636 F.3d 901 (7th Cir. 2011) ("*Taylor II*"); *see also United States v. Taylor*, 277 F. App'x 610 (7th Cir. 2008) (non-precedential decision). *Taylor* was a capital case in which the defendants were charged with, *inter alia*, Hobbs Act robbery and the commission of a murder in the course of that robbery. The defense objected to the government's use of peremptory challenges to exclude two African American members of the

venire from the jury, Ms. W. and Ms. G. The objections were addressed collectively, and in the process of overruling them, the district court neglected to specifically consider and resolve the strike of Ms. W. The government had given the same general rationale for the two strikes (statements that the panelists had given during voir dire expressing a reluctance to impose the death penalty on an individual who had not himself shot the victim), but the credibility of that rationale turned on the specific answers each of the two African American panelists had given in response to questions by both government and defense counsel. And when all of the relevant questions posed to and answered by Ms. W. were examined, it became obvious that her views on the death penalty were comparable to those of a white panelist whom the government had not stricken from the jury. Because the district court had never addressed Ms. W. individually, let alone attempted to reconcile her similarities with the seated white juror, we found it necessary to remand the case to give the district court the opportunity to supplement the record with its findings as to whether the government's stated rationale for striking Ms. W. was credible or whether the defense had met its burden of demonstrating that the strike was discriminatory. On remand, the district court conducted a hearing and again rejected the defendant's *Batson* challenge. Ultimately, we reversed, concluding that the rationale the government had articulated at trial for excluding Ms. W. did not hold up to scrutiny in view of her material similarities to the seated white juror vis-a-vis the death penalty. *See Taylor I*, 509 F.3d at 844–46; *Taylor II*, 636 F.3d at 905–06. The government had attempted to justify striking her after the fact with a different rationale, but we

declined to consider that rationale precisely because it was not put before the district court during voir dire when the *Batson* challenge was made. *Id.*

Brasher initially cited our opinion in *Taylor II* for the point we just mentioned: that in evaluating the credibility of the rationale for the exclusion of a prospective juror, a court must ignore *post hoc* rationales never advanced when the striking of the juror was challenged under *Batson*. But in the give and take of oral argument on Brasher's *Batson* claim, Brasher's counsel expanded his argument to posit that the district court here, as in *Taylor*, failed in the first instance to address each of the excluded African American jurors individually and to reconcile the government's rationale for the exclusion in light of their individual circumstances.

We agree with Brasher that the district court's *Batson* findings would be clearer and stronger had the district court expressly addressed the evident inconsistency between the government's stated reason for excluding the two African American venire members and its decision not to exclude Mr. M, who like them had a close family member who had been tried on a narcotics charge. We take the opportunity to reiterate that when one or more peremptory challenges are challenged under *Batson*, the district court's analysis should (a) address each excluded juror individually in light of all of the material circumstances, including similarities between the excluded juror and seated jurors, and (b) expressly resolve any argument as to why the proffered rationale for excluding the juror is pretextual. But apart from the omission to do so here, this case is materially different from *Taylor*, and we are not convinced that a remand is necessary as it was in *Taylor*.

First, although Brasher challenged the exclusion of multiple jurors and the district court addressed the excluded jurors collectively rather than individually, just as in *Taylor*, this case does not present the same need for juror-specific factual development that *Taylor* did. In *Taylor*, it was necessary to consider in full the answers touching upon the death penalty that each of the excluded jurors had given during *voir dire* and to compare them with the answers given by a white juror as to whom the government had not exercised a peremptory challenge. In this case, the material facts concerning both the excluded and seated jurors were both known to the district court and straightforward: Ms. W. and Mr. H., who were African American, in one instance had a close family member who had been charged with a narcotics offense and in the second instance had been convicted of such an offense himself. According to the government, they were both excluded from the jury on that basis, as was a white member of the venire, Mr. K, whose brother had been convicted on a drug charge. But Mr. M., another white member of the venire whose brother had been convicted of narcotics trafficking, was not excluded. These facts were fully aired before the district court, and the court (twice) rejected the notion that the government's explanation for striking Ms. W. and Mr. H. was pretextual in view of the fact that it did not strike Mr. M.

The only thing missing from the district court's findings, as we have said, is a statement as to why the court was not persuaded that the government's acceptance of Mr. M. onto the jury did not bespeak pretext. We could remand for that limited purpose, but we are not persuaded that step is necessary.

There can be no doubt that the district court understood the basis for Brasher's pretext argument: Brasher's counsel made that clear at the time of the *Batson* hearing (R. 887 at 22–23); and the government's counsel both expressly acknowledged not challenging Mr. M. while adding that the government *had* excluded Mr. K. (R. 887 at 223). And in denying Brasher's motion for a new trial, the court expressly acknowledged that it was the seating of Mr. M. that was the basis for Brasher's pretext argument. R. 828 at 10, 12. So we have no ground on which to suspect that the district court overlooked and failed to consider pretext.

In short, the pertinent facts were developed and considered by the district court. What remains is for us to consider whether, in light of these facts, the district court committed clear error in finding that the government's exclusion of the two African American jurors was motivated by the non-discriminatory rationale it articulated to the court rather than their race.

In defense of the district court's ruling (and the propriety of the exercise of its peremptory challenges), the government argues that Mr. M. was different from the stricken jurors in the sense that he had disowned his brother once he learned that he was engaged in narcotics trafficking. *See* R. 864 at 82–83. That revelation—elicited by defense counsel during voir dire in follow-up questioning of Mr. M.—gave the government reason to believe that Mr. M. would not be sympathetic to Brasher's defense, or hostile to the government's case, notwithstanding the similar charges levied against Mr. M's brother.

The problem with this explanation is that it was not voiced in the district court and instead was articulated for the first time on appeal. Brasher rightly argues, that the validity of the government's challenged peremptory challenges must stand or fall on the reasons provided to the district court during the *Batson* inquiry. *See Miller-El v. Dretke*, 545 U.S. 231, 246, 252, 125 S. Ct. 2317, 2328, 2332 (2005); *Taylor II*, 636 F.3d at 906. The government defends its after-the-fact rationale regarding Mr. M. by suggesting that *Batson* requires it only to explain its decision to *strike* a given juror rather than its decision *not* to strike another. We are not persuaded. It is true, of course, that it is the decision to strike a potential juror based on race that is prohibited by *Batson*, but the characteristics of venire members that a party chooses not to strike frequently shed light on the veracity of the party's proffered explanations for the use of its peremptory challenges. *See Miller-El*, 545 U.S. at 241, 125 S. Ct. at 2325 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."); *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248 (2019) ("Comparing prospective jurors who were struck and not stuck can be an important step in determining whether a *Batson* violation occurred."); *Taylor II*, 636 F.3d at 905–06; *Mahaffey v. Page*, 162 F.3d 481, 485–86 (7th Cir. 1998); *see also Snyder v. Louisiana*, *supra*, 552 U.S. at 478, 483–84, 128 S. Ct. at 1208, 1211–12. Mr. M., like Ms. W. and Mr. H., had a family member who was charged with a drug offense, but rather than using a peremptory challenge to strike Mr. M as it had Ms. W. and Mr. H, the government allowed him to be seated on the jury. So in

defending its decision to strike Ms. W. and Mr. H., the government was required to offer a timely explanation not only for its decision to strike the two African American venire members, but also for its decision *not* to strike Mr. M., a white member of the venire who otherwise appears to have been similarly situated with the excluded African American panelists. Because it did not do so, we put aside the government's belated explanation.[2]

Nonetheless, focusing on evidence and arguments that were before the district court, we find no clear error in the court's decision to credit the government's stated non-discriminatory rationale for using its peremptories to strike Ms. W. and Mr. H. By itself, the fact that the government chose to allow a white venire member to be seated on the jury despite a prior drug charge against a family member tends to suggest that the government's stated rationale for striking Ms. W. and Mr. H. was not its true reason. *E.g.*, *Miller-El*, 545 U.S. at 241, 125 S. Ct. at 2325–26. But this was not the whole of the evidence before the district court. As the government pointed out below, it had also stricken a white venire member, Mr. K., based on a drug charge to which his brother had pleaded guilty; and Brasher has not challenged that this was in fact the reason Mr. K. was

---

[2]  Certainly the facts underlying the government's belated rationale were before the district judge, who had presided over the voir dire, and these facts theoretically could have informed the judge's decision that the government did not exercise its peremptory challenges in a discriminatory manner. But because this rationale was not argued to the district court, and the court did not independently raise it in either of its two decisions rejecting Brasher's *Batson* challenge, we can only assume that these facts did not influence the court's decision-making.

stricken. So this was not a rationale that the government used *solely* to exclude African American individuals from the jury.[3] Moreover, the government did not use its peremptory challenges to exclude *all* African American persons on the venire: One African American person was seated on the jury despite the fact that the government had peremptory challenges left to exercise, resulting in a jury that was consistent with the demographics of the New Albany Division of the Southern District of Indiana (where the case was tried), which has a relatively small African American population. *See United States v. White*, 582 F.3d 787, 802 (7th Cir. 2009) (sustaining denial of *Batson* challenge where proffered non-discriminatory rationale was used to strike both white and African American jurors, one African American was seated on jury, government did not use all of its peremptory challenges, and government had proposed seating African American panelist as alternate); *United States v. Hendrix*, 509 F.3d 362, 370–71 (7th Cir. 2007) (sustaining denial of *Batson* challenge where use of proffered rationale to exclude a white panelist as well as an African

---

[3]   The government represents on appeal that it excluded a second white juror, Mr. B., whose uncle had a drug conviction, on the same basis. *See* R. 864 at 31, 67. The government did not point this out to the district court below (although the prosecutor may have had Mr. B. in mind when he professed confusion as to whether it was Mr. K.'s uncle or brother who had a narcotics conviction, *see* R. 887 at 22), and the court itself never mentioned Mr. K., so presumably it did not factor into the district court's rationale in rejecting Brasher's *Batson* challenge. Brasher does not contest that Mr. B was excluded on this basis, however, and the government's use of a peremptory challenge as to Mr. B. lends further support to the notion that the government's use of its peremptory challenges was not animated by the race of the stricken jurors.

American panelist "further illuminates the non-discriminatory nature of the prosecution's strikes and erodes notions of pretext in the prosecution's motive for the strikes"); *United States v. Griffin*, 194 F.3d 808, 826 n.9 (7th Cir. 1999) ("the fact that the Government did not challenge the other black juror further 'weaken[s] the argument that the Government's strikes were based on a motive to discriminate'") (quoting *United States v. Hughes*, 970 F.2d 227, 232 (7th Cir. 1992)); *cf. Mahaffey*, 162 F.3d at 484–86 (noting that where prosecution had used its peremptory challenges to exclude all seven African American members of venire, it was wrong to emphasize fact that particular rationale offered to explain those strikes was also used to strike white panelists while ignoring fact that same rationale applied equally to other white panelists who were seated on jury).

In evaluating whether the prosecution's stated rationale for striking the two African American jurors was genuine, the district court was required to consider the totality of the circumstances. *Snyder*, 552 U.S. at 478, 483–84, 128 S. Ct. at 1208, 1211–12. Here, there were objective facts that were both inconsistent and consistent with the government's race-neutral explanation. And, to some extent, the court's evaluation of pretext depended on intangible signs of the prosecutor's candor. "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 854 (1985)). As we noted at the outset of this discussion, the district court in this case expressly found the prosecutor's proffered rationale for excluding Ms.

W. and Mr. H. to be "non-discriminatory, reasonable, *and credible*." R. 828 at 13 (emphasis ours).

Given the deference we owe the district court on this question, *see Batson*, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n. 21, we cannot say that the court clearly erred in giving credence to the government and finding that its stated reason for striking Ms. W. and Mr. H. was not pretextual. Certainly it is possible that a different judge might have reached a different conclusion based on the facts we have highlighted. But that possibility alone does not demonstrate that there was clear error infecting the court's resolution of the *Batson* objection. *See United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 495, 70 S. Ct. 711, 717 (1950); *United States v. Stephens*, 514 F.3d 703, 712 (7th Cir. 2008) (quoting *United States v. Mendoza*, 457 F.3d 726, 729 (7th Cir. 2006)). Based on the evidence before the district court, we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948).

D.  *Improper remarks in closing argument*.

Brasher faults the government for making two categories of improper remarks in closing argument: (1) vouching for the credibility of its own witnesses; and (2) appealing to regional prejudice. Because Brasher did not object to the remarks at the time, our review is for plain error only. *E.g., United States v. Chaparro*, 956 F.3d 462, 484 (7th Cir. 2020). The remarks at issue here were relatively innocuous, and we are not convinced they amount to prosecutorial misconduct, let alone an obvious manifestation of misconduct, and certainly not wrongdoing

raising the prospect that Brasher was denied a fair trial. *See id.* (laying out the elements of plain error).

The prosecutor did not vouch for the credibility of its witnesses. "Impermissible vouching occurs when a prosecutor expresses her personal belief in the truthfulness of a witness, or when a prosecutor implies that facts not in evidence lend to a witness's credibility." *United States v. Jones*, 889 F.3d 876, 881 (7th Cir. 2018) (citing *United States v. Wolfe*, 701 F.3d 1206, 1212 (7th Cir. 2012)). In a portion of his closing argument addressing the testimony of Brasher's co-defendants, who had opted to plead guilty and cooperate with the government, the prosecutor asserted:

> I think you can be confident that their testimony was truthful, because it was consistent. Everything they said was internally consistent with each other, but it also reinforced exactly what you heard in wire transcripts, intercepts that took place in this case, court-authorized wire intercepts.

R. 890 at 837. He went on to discuss what the recorded conversations showed. And he later emphasized in rebuttal that although the cooperating witnesses were hoping to benefit from their testimony, they had to be truthful in order to do so. R. 890 at 863. This is standard fare in addressing the credibility questions posed by cooperating witnesses and does not constitute vouching. The argument was grounded in the evidence before the jury, and at no time did the prosecutor claim personal knowledge of the witnesses' veracity or imply

that evidence outside of the trial record confirmed their credibility, which is the sort of vouching that is proscribed.

As for the purported appeal to regional bias, what the government's counsel did was invite jurors, as they evaluated the evidence presented in the case, to use their common sense, which counsel suggested "we Hoosiers really seem to have more than most other folks." R. 890 at 865. We do not take this to be an implicit attack on Kentuckians like himself, as Brasher seems to have construed it. The remark may reflect some bias in favor of Hoosiers, but again, it is relatively innocuous as these sorts of remarks go. *Cf. United States v. Durham*, 211 F.3d 437, 441–42 (7th Cir. 2000) (appeal to jurors' "good Midwestern common sense" did not constitute misconduct). Certainly it did not unduly prejudice Brasher.

E.  *Procedural error with respect to section 851 notice of prior conviction.*

As we noted at the outset, Brasher was subject to an enhanced statutory sentence of life as a result of his prior felony narcotics convictions which were disclosed prior to the trial in two section 851 notices filed by the government. *See* § 841(b)(1)(A) (2016) & n. 1, *supra*. The conviction referenced in the first information was a conviction Brasher incurred in 2000, based on drug trafficking activity that took place in 1998, when Brasher was 17. (He was tried as an adult.) At the sentencing hearing, Brasher argued for the first time that he was not the person identified in the records of that conviction. R. 878 at 56–57, 85. *See United States v. Arango-Montoya*, 61 F.3d 1331, 1339 (7th Cir. 1995) (per curiam) ("it is always possible that the government was mistaken and there was no prior conviction,

or that the facts alleged in the government's information of prior conviction are incorrect"). He made a similar challenge to the 2013 convictions identified in the second section 851 notice, which the district court rejected on the merits. R. 878 at 89, 131. But the court did not reach the merits of his objection to the 2000 conviction, reasoning that because the conviction was more than five years old, Brasher could not deny the existence of the conviction. R. 878 at 84–85. *See* § 851(e).[4] In actuality, Brasher was barred only from challenging the validity of the conviction, which is not the objection he presses here. *See Arreola-Castillo v. United States*, 889 F.3d 378, 385–90 (7th Cir. 2018). So the district court erred in this regard. Section 851 left Brasher free to challenge whether he was the individual convicted. *Id.*

There is a real question, nonetheless, whether Brasher waived this issue. Brasher never contested the existence of this conviction in writing, *see* § 851(c)(1) (defendant to file "written response" to government's § 851 information; district court shall thereafter hold hearing to determine any issues raised by response); *Arreola-Castillo*, 889 F.3d at 384–85; and more to the point, the written objections he *did* file to the section 851 enhancement were silent on this point. R. 836. *See* § 851(d)(1) ("[i]f the person files no response to the information … the court shall proceed to impose sentence upon him as provided

[4] The court did instruct the government, following the sentencing, to verify the 2000 conviction through a check of Brasher's fingerprints and advise the court if there was a discrepancy suggesting that Brasher was not the individual convicted. R. 873 at 61, 121. The record does not reveal the outcome of any such inquiry.

by this part").[5] Indeed, Brasher's sentencing memorandum acknowledged and, seemingly, accepted, the 2000 conviction as part of his criminal history. R. 833 at 7, 20. As a result, both the court and the government, with no advance warning that Brasher intended to contest the existence of this or any other prior conviction, were forced to address Brasher's objections on the fly, without the opportunity to make as complete of a record on the issue as they otherwise might have done.[6] It is Brasher who emphasizes that the government, in the face of his objection, was required to prove the existence of his conviction beyond a reasonable doubt, *see* § 851(c)(1); *Arreola-Castillo*, 889 F.3d at 704, and yet, ironically, it was his own tardiness in voicing the objection that interfered with the government's ability to meet his challenge. Under these circumstances, his failure to object until the sentencing hearing was underway at the least resulted in a forfeiture, in the same way that a defendant's failure to raise a contention that he was deprived of his constitutional rights or that a trial error occurred at a time when the objection could be fully addressed and, if necessary,

---

[5]   The statute also requires a "timely challenge" to the government's information. § 851(c)(2). We have not yet decided whether the timeliness requirement applies to any and all challenges under section 851, including challenges to the existence of a prior conviction, although we have acknowledged that other circuits have answered this question in the affirmative, with the consequence that such challenges can be waived. *See United States v. Webster*, 628 F.3d 343, 345 (7th Cir. 2010) (per curiam) (collecting cases).

[6]  The government was able to locate a police sergeant from Louisville who was able to identify Brasher in court as the person charged and convicted in 2013.

rectified, is routinely deemed to forfeit the objection. *See generally Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 677 (1944) ("[n]o procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make a timely assertion of the right …"); *Puckett v. United States*, 556 U.S. 129, 134, 129 S. Ct. 1423, 1428 (2009) ("[t]his limitation of appellate-court authority [resulting from forfeiture of an objection] serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them"); *see also, e.g.*, *United States v. Barber*, 937 F.3d 965, 971 (7th Cir. 2019) (forfeiture of Fourth Amendment claim); *United States v. Pankow*, 884 F.3d 785, 790–91 (7th Cir. 2018) (forfeiture of sentencing issue); *United States v. Irby*, 558 F.3d 651, 655 (7th Cir. 2009) (forfeiture of Confrontation Clause objection to confidential informant's out-of-court statements); *United States v. Jenkins*, 772 F.3d 1092, 1096–97 (7th Cir. 2014) (forfeiture of objection to criminal history calculation). We therefore confine our review to one for plain error.

The district court's error was not plain in the sense that Brasher's substantial rights were affected, *see Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018) (articulating elements of plain error in sentencing context), as there can be no real doubt that Brasher was the individual convicted in 2000. In support of the section 851 enhancement, the government presented certified records of the 2000 conviction as well as the 2013 convictions (which Brasher does not challenge here). Brasher nonetheless faults the government for failing to produce a booking photograph, fingerprint, or other evidence in order to prove, beyond a reasonable doubt, that he was in

fact the person convicted in 2000. *See* § 851(c)(1). But courts have recognized that certified court records are sufficient to prove the fact of a defendant's prior conviction beyond a reasonable doubt. *United States v. Miller*, 782 F.3d 793, 800–01 (7th Cir. 2015); *Arreola-Castillo*, 539 F.3d at 704–05; *United States v. Jones*, 700 F.3d 615, 629–30 (1st Cir. 2012) (Ripple, J.). In this case, the certified records pertaining to the conviction (which include both the charging document and the judgment of conviction) collectively reflect Brasher's name, date of birth, and social security number; and this is not to mention Brasher's own acknowledgment of the conviction in his sentencing memorandum. Looking at this evidence in the light most favorable to the government, a rational factfinder could readily and reasonably find beyond a reasonable doubt that Brasher was the individual convicted. *See generally Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). At no time, either below or on appeal, has Brasher identified anything which, in spite of the record evidence indicating that Brasher was the subject of the 2000 conviction, suggests that he was not in fact the individual convicted. He has not established plain error. *See Chaparro*, *supra*, 956 F.3d at 468 (forfeited claim regarding sufficiency of evidence is reviewed for manifest miscarriage of justice, which requires showing that record is devoid of evidence of guilt or that evidence as to key element of offense is so tenuous that conviction would be shocking).

F.   *Violation of 18 U.S.C. § 2517(5) by using wiretap discussions of murder at trial and sentencing without judicial approval.*

During the investigatory phase of this case, the district court had authorized Title III electronic surveillance of multiple individuals' phones for the stated purpose of gathering

evidence of narcotics trafficking. Pursuant to 18 U.S.C. § 2517(3) and (5), the government was authorized to introduce the results of that surveillance into evidence at trial and at sentencing insofar as the recordings related to the charged narcotics conspiracy; but use of the recordings to establish an unrelated crime required further court approval. *See United States v. Brodson*, 528 F.2d 214, 215–16 (7th Cir. 1975). In the course of the approved surveillance of phone calls between Brasher and Shelton, the government intercepted conversations relating to the murder of another customer/dealer of Shelton's with a large outstanding drug debt. Shelton recruited Brasher to arrange the killing of that individual in order to set an example that would frighten his other customers (several of whom were likewise delinquent) into timely payment of their debts to him. The government introduced evidence of these conversations at sentencing in aggravation. And although the government did not play any of these recorded discussions of murder for the jury at trial, the jury was given a transcript of a conversation from which the references to the murder were not redacted as they should have been. Because the government never asked the court for authorization to introduce evidence of the murder discussions, Brasher contends that the government violated section 2517 to his undue prejudice.

With respect to the unredacted transcript given to the jury, any error was surely harmless. The reference to the murder in that transcript was so coded as to be undecipherable absent additional testimony illuminating what the discussion was concerning.

As to the use of the recorded conversation(s) at sentencing, we are not convinced that prior authorization was required

before the recording could be used. The execution of the delinquent drug dealer was part and parcel of Shelton's narcotics trafficking organization. Shelton ordered the hit in order to make an example of a deadbeat and thus ensure that other dealers would timely pay their debts to him. In the same way that a drug kingpin might order that a rogue subordinate be beaten or killed in order to maintain discipline within the organization, Shelton's order was in furtherance of the drug conspiracy. Had the conversations concerned an offense that pre-dated or was unrelated to the aims and business of the conspiracy, Brasher might have a point. But Brasher's willingness to plan and execute a murder of a fellow dealer on Shelton's behalf was in service of the charged drug trafficking enterprise, and as a matter of sentencing it was highly relevant in assessing his culpability as a participant in that enterprise. *Cf. United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (statements by co-conspirator confessing to murder committed when he and defendant were attempting to collect drug debt were admissible pursuant to Fed. R. Evid. 801(d)(2)(E) as statements made in furtherance of conspiracy).

## III.

For all of the reasons given, we reject Brasher's claims of error and affirm his conviction and sentence.

AFFIRMED