In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 20-2673 & 21-1158

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

PABLO HIDALGO-SANCHEZ and LUIS F. GOMEZ

*Defendants-Appellants*.

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 17-CR-113 — **Pamela Pepper**, *Chief Judge*.

ARGUED JANUARY 5, 2022 — DECIDED MARCH 31, 2022

Before KANNE, WOOD, and BRENNAN, *Circuit Judges*.

KANNE, *Circuit Judge*. Pablo Hidalgo-Sanchez and Luis F. Gomez, among others, were indicted for their roles in a drug-distribution conspiracy operating in Milwaukee, Wisconsin. Each was convicted by a jury and now appeals.

Hidalgo-Sanchez challenges the sufficiency of the evidence against him, the propriety of venue in the Eastern District of Wisconsin, and the failure of the trial judge to give a

limiting instruction to the jury, but we find no reversible error among these issues.

Gomez challenges the government's use of bolstering testimony. We agree that the government's use of such testimony constituted error, but ultimately conclude that the error does not warrant reversal.

Therefore, we affirm both convictions.

## I. BACKGROUND

*A. Factual Background*

In June 2017, twenty-one people were indicted for their alleged roles in a drug-trafficking conspiracy that sought to distribute methamphetamine, cocaine, and heroin in Milwaukee, Wisconsin. Among the indicted were defendants Pablo Hidalgo-Sanchez (also known by the name "PeeWee") and Luis F. Gomez (also known as "Paco"), the appellants in this case.

The indictment was the result of a long-term investigation by the DEA and the High Intensity Drug Trafficking Area ("HIDTA") task force. DEA agents first identified a money courier operating in Chicago and Milwaukee, and the investigation expanded from there. Eventually, investigators obtained authorization to monitor phones used by members of the organization. The information investigators learned from these wiretaps enabled them to further surveil the organization using pole cameras and in-person observation.

Gomez is the purported leader of the organization. He was in communication with suppliers in Mexico and he oversaw the importation of controlled substances to the Milwaukee area. The organization moved drugs to the Midwest by hiding them in secret compartments in vehicles that were then

loaded onto commercial car carriers. When the drugs reached their destination, they were replaced with proceeds and the cars were sent back to their source.

Over the course of the investigation, agents seized four such vehicles. The basic details of each of these seizures are outlined below:

- On March 5, 2017, law enforcement officers seized a silver Chrysler 300 near Albuquerque, New Mexico, containing eleven kilograms of cocaine.

- On April 18, 2017, law enforcement officers seized a silver Volkswagen Jetta in West Chicago, Illinois, containing $145,380.

- On May 14, 2017, law enforcement officers seized a Mercury Marquis in Seward, Nebraska, containing $99,920 and one kilogram of cocaine.

- On July 25, 2017, law enforcement officers seized a Mercedes SUV in Livingston County, Michigan, containing about five kilograms of methamphetamine.

While Gomez arranged the first three of these intercepted shipments, Hidalgo-Sanchez was responsible for the last. After they were arrested, Gomez and Hidalgo-Sanchez were charged in Count One of the indictment, together with fifteen others, with conspiring to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and also with aiding and abetting the conspiracy in violation of 18 U.S.C. § 2.

*B. Evidence*

The evidence in this case consists of physical evidence, testimony based on in-person surveillance and other law enforcement activities, pole-camera videos, and the fruits of a wiretap investigation. In addition to call recordings and transcripts of those calls, the wiretap investigators also collected GPS location information for all of the phones used in intercepted calls. Depending on the carrier, the location information would indicate a broad area around a cell tower or a smaller subsection of that area, or it might even pinpoint a phone within thirty meters. Investigators would often send officers to conduct in-person surveillance at the location where a call was made so that they could collect more information or identify new coconspirators.

Evelyn Lazo, a Milwaukee police officer and HIDTA task force member, participated in all aspects of the investigation. She is also a native Spanish speaker, so she was able to verify that the English translations of the intercepted calls were accurate. Because she was intimately acquainted with the voices of everyone recorded on the calls, she was able to identify the speakers on all calls. She also testified that Hidalgo-Sanchez identified his own voice on two of the calls when he was arrested.

Detective Matthew Cooper explained how investigators associated phone numbers with specific people. They began with information that linked coconspirators Jonathan Martinez-Acosta and Juan Avina to certain phone numbers. Then they began to intercept calls on those numbers. Officer Lazo explained that when they intercepted calls or text messages, they received toll data. Toll data includes the phone numbers of the calling and receiving phones, the date and time of the

call, how long the call lasted, and sometimes location information. Detective Cooper testified that they started identifying other people intercepted on the calls. If someone was not known to the investigation, then they might use in-person surveillance to figure out their identity. Using these methods, they were able to associate all of the intercepted phone numbers with specific people and, when appropriate, expand the wiretap to include those numbers.

### 1. Bryan Banks

One man, Bryan Banks, gave key testimony during the trial. Banks testified that he worked with Gomez, among others. He explained how much he paid for kilograms of cocaine. He also told the jury that he and his coconspirators referred to drugs and money using coded language. He ordered kilograms using just a bare number (e.g., "one" or "two"). Heroin was "dog," "puppy," "boy," or "China rice." He also explained that "hard and solid" cocaine was preferable to "powdery" cocaine because the latter might have been adulterated. Banks identified Gomez as the man he would get drugs from. He also identified Gomez's voice on several intercepted calls.

On July 12, 2017, a call between Banks and Gomez was intercepted. In that call, Banks requested "two." Then he and Gomez met up at the location where Banks stored his product. Milwaukee police officer and HIDTA task force member Miguel Correa, Jr. testified about another such meeting: On September 15, 2017, Banks texted Gomez, indicating that he wanted "one." Officer Correa immediately went to Banks's residence, where he witnessed Gomez arrive and meet Banks out of sight.

### 2. *Chrysler 300*

Detective Cooper testified that he directed agents to surveil a Wal-Mart parking lot on January 25, 2017, in anticipation of a heroin shipment arriving. The agents collected video and photographic evidence that showed coconspirators Martinez-Acosta and Mario Esquivel-Sotelo receive a gray Chrysler 300 from a commercial car carrier. Detective Cooper entered the car's license plate number into a national automated license plate reader program that would alert him if one of the program's cameras identified the plate number.

Later that day, several calls between Gomez and Martinez-Acosta were intercepted. Gomez confirmed that they got the right vehicle and told Martinez-Acosta that he would tell him "how to open that shit up so that [he] can get out those things and then put it in the garage." Gomez also warned Martinez-Acosta that the car has "a listening device and it shows where the car is," so he shouldn't say anything.

Detective Cooper received an alert from the license plate reader program on March 5, 2017, that the Chrysler 300 was in New Mexico. He notified the New Mexico State Police, who intercepted it. Those officers found eleven kilograms of cocaine, a GPS tracker, and an audio recorder.

### 3. *Jetta*

Detective Cooper testified that on February 28, 2017, a pole camera captured video of Gomez backing out of his garage in a silver Volkswagen Jetta. A few days later, Gomez and several others were seen with the Jetta in an alley behind Gomez's apartment. Shortly thereafter, security cameras covering a Wal-Mart parking lot showed the Jetta being loaded onto a commercial car carrier. Officer Correa noted that a

white SUV he had surveilled previously was monitoring the loading and left upon completion.

Homeland Security Investigations Special Agent and HIDTA task force member Russell Andrew Dykema testified that he shot video of the silver Jetta being loaded onto another car carrier on April 18, 2017. The jury also saw this video. After the Jetta was loaded onto the carrier, Special Agent Dykema followed it for "hours" into Illinois. A number of other officers arrived, stopped the car carrier, inspected the Jetta, and found $145,380 and a GPS tracking device with an audio recorder.

About a month later, a phone conversation that Gomez had with two men in Mexico only identified as Peñasco and Tomas—characterized by the government as the sources of supply—was intercepted. They discussed the seizure of the Jetta and the cash in it. They thought it was very "strange."

*4. Grand Marquis*

Detective Cooper testified that a March 22, 2017, pole-camera video showed a commercial car carrier depositing a white Mercury Grand Marquis in an alley. Esquivel-Sotelo and Oscar Garnica-Manriquez were there to receive the vehicle. Esquivel-Sotelo was seen using a phone, and at the same time a call between him and Gomez was intercepted. Esquivel-Sotelo asked Gomez how much money he needed to pay the driver of the car carrier, and Gomez told him how to proceed. Gomez also instructed Esquivel-Sotelo to "put that away" and "send me the picture."

Almost two months later, a call between Gomez and Esquivel-Sotelo was intercepted. In that call, Esquivel-Sotelo confirmed that he was "at the glass place" getting "glass" and

had arranged for the Marquis to be picked up. Shortly thereafter, Gomez called Garnica-Manriquez and told him to "pick up the money and head over to my house and start wrapping, dude." DEA Special Agent Kellen Williams then observed Garnica-Manriquez remove a windshield from the back of a Hummer and carry it into the garage.

Based on information Detective Cooper provided to Deputy Dave Frye of the Seward County Sheriff's Department, the Grand Marquis was seized in Nebraska on May 13, 2017. Deputy Frye testified that he removed the windshield because he knew that the Grand Marquis had a void space that can be accessed that way. He found three packages and a GPS tracker. Two of the packages contained cash—$99,920 in total—and the third contained about a kilogram of cocaine.

On May 15, 2017, Gomez called Tomas to tell him that the Grand Marquis had been stopped, and then he called Peñasco, who asked him how many "hamburgers" were in the vehicle. Gomez responded that there were three—"two (2) of them were paper (money) and … the bad one."

*5. Mercedes SUV*

On July 19, 2017, investigators intercepted two calls between Hidalgo-Sanchez and someone named Aaron at a car hauling company called Mueve Tu Carro in Stockton, California. Hidalgo-Sanchez identified himself as "Roberto Martinez" and arranged for a Mercedes SUV to be transported from California to Michigan. Detective Cooper used this call to obtain authority to monitor the location of the car carrier.

When the car carrier was in Michigan, Detective Cooper alerted the Michigan State Police. Michigan State Police Officer Daryl Myers testified that he assisted in stopping the car

carrier. He looked at the bill of lading for the Mercedes SUV and saw a phone number with a 608 area code, which did not match the destination—Sturgis, Michigan. This, among other inconsistencies, raised his suspicion. After a canine alerted officers to drugs in the vehicle, they searched and found about five kilograms of methamphetamine.

### 6. Other Acts

In one of the earliest recorded conversations, Hidalgo-Sanchez spoke with Avina, on December 5, 2016, about drug quantities and customer needs. At trial, Detective Cooper testified that he set up surveillance at Avina's apartment shortly after the call. While there, he saw Hidalgo-Sanchez and Avina, among others, leave the apartment building in rapid succession. This was just one of "many occasions" that Detective Cooper conducted surveillance on Hidalgo-Sanchez.

In a January 5, 2017 call with Gomez, Hidalgo-Sanchez requested half a kilogram of drugs. When Gomez told him that he did not have any, Hidalgo-Sanchez inquired about when the next shipment would be delivered, and Gomez told him it would be there in three days. A little less than two weeks later, they spoke again. This time, Gomez told Hidalgo-Sanchez that a car containing only heroin had arrived, but that other drugs would follow in a separate shipment the next day.

On February 15, 2017, Hidalgo-Sanchez spoke over the phone with Esquivel-Sotelo, who told Hidalgo-Sanchez that there was a fake fifty-dollar bill among the $600 Hidalgo-Sanchez gave him, and that Tita, Gomez's sister, had discovered it. Hidalgo-Sanchez, surprised, asked for the fake bill "so that [he could] return it to that dude."

The next day, Gomez and Hidalgo-Sanchez spoke again. This time it was Hidalgo-Sanchez who offered two types of drugs to Gomez, who agreed to send a courier to buy them. Hidalgo-Sanchez said that thirty-five kilograms were available, but Gomez only asked for "one of each." Gomez told Hidalgo-Sanchez to explain to the courier which package contained which drug.

In a March 6, 2017 call, Hidalgo-Sanchez complained to Gomez about the quality of a substance that had been delivered. The color was "bad ass," but the product was damp and falling apart. Twenty-five minutes later, the two spoke again. Hidalgo-Sanchez had a "receipt"—likely money or drugs—for Gomez and wondered whether he should deliver it then or "put it all together" and deliver later. They agreed to meet at Gomez's residence.

A couple days later, there was a similar quality-assurance call. Hidalgo-Sanchez complained about drugs that were "like dirt" and "falling apart." He had taken some to a "guy" who had "bought [a] quarter" kilogram from him, but "he didn't want it." Hidalgo-Sanchez requested that Gomez exchange it for product that was "more solid," and Gomez agreed. Gomez assured Hidalgo-Sanchez that the replacement was "harder," and that Hidalgo-Sanchez could "give [him the] powdery one," and he would "see what [he could] do with that."

On March 10, 2017, Gomez answered a call from Hidalgo-Sanchez, referring to himself as the "number one from Milwaukee." Hidalgo-Sanchez asked if Gomez wanted any of the two kinds of drugs he had from California. Gomez first told him to bring it over to where he was, but then asked for a picture instead.

Eleven days later, on March 21, 2017, another call between the two was intercepted. Hidalgo-Sanchez was at a private party at a restaurant in Milwaukee. He tried to get Gomez to bring some drugs because he had a customer who was ready and willing to buy a "quarter." Gomez said he only had the "lo[o]se" kind that Hidalgo-Sanchez had returned to him. Hidalgo-Sanchez then asked when he could expect more, and Gomez said "supposedly in a little bit." Finally, he inquired about whether Gomez could help him purchase product from a different supplier. The supplier would only sell if they took "everything at once" and paid cash at the time of sale.

On June 22, 2017, Gomez and Hidalgo-Sanchez discussed prices for kilograms of cocaine. Gomez offered to "len[d]" several kilograms to Hidalgo-Sanchez for a few days for him to sell. Hidalgo-Sanchez was interested but noncommittal.

The next month, on July 10, 2017, the two discussed drug proceeds, and Hidalgo-Sanchez agreed to temporarily provide cocaine to Gomez, despite Gomez typically supplying Hidalgo-Sanchez. Gomez asked him to "set 4 aside," and Hidalgo-Sanchez agreed.

In an August 16, 2017 call, Gomez and Esquivel-Sotelo discussed the distribution of drug proceeds. Esquivel-Sotelo explained that he gave $2,000 to Hidalgo-Sanchez and the remainder to Gomez's sister.

Finally, on September 1, 2017, Gomez and Hidalgo-Sanchez spoke again by phone. Hidalgo-Sanchez asked if Gomez still had some of "that fucked up dog"—low-quality heroin. He wanted to give a customer a sample. Gomez explained that he had "already delivered it all" but that another shipment would be arriving a few days later. They also

discussed the price of cocaine available through Gomez's Chicago supplier.

*C. District Court Proceedings*

*1. Bill of Lading*

Above, we mentioned that Michigan State Police Officer Daryl Myers became suspicious when he saw several inconsistencies on the bill of lading associated with the transport of a Mercedes SUV. One of the inconsistencies was that the number listed for the recipient of the vehicle had a Madison, Wisconsin area code instead of an area code for somewhere near the destination in Sturgis, Michigan.

When the government moved to admit the bill of lading, counsel for Hidalgo-Sanchez objected, asserting that it constituted hearsay if offered for the truth of any of the matters asserted therein. The government explained that it was only offering the bill of lading to show why officers investigated further (because of the inconsistencies), and not for the truth of what was asserted on it. Counsel for Hidalgo-Sanchez followed up by asking the court to give a limiting instruction to the jury explaining what it was being admitted for. The court explained that it would give "legal instructions" at the end of the case, and it admitted the bill of lading for the stated purpose over the objection.

Toward the end of the trial, Hidalgo-Sanchez submitted a proposed limiting instruction. It read:

> The court received into evidence government Exhibit 369, which is the bill of lading seized from the car-hauler during the stop and search in Michigan on July 25, 2017. The bill of lading has certain information written on it. The government represented to

> the court that the exhibit was offered not for the truth of any writing contained on the exhibit; but, rather, only [to] demonstrate the effect it had on the officer conducting the stop and the search of the cars, and to explain the next steps he took. You may consider the bill of lading for that purpose only. You may not consider it for the truth of any matter written on the bill of lading.

He supported this instruction by citing Federal Rule of Evidence 105, which states, "If the court admits evidence that is admissible … for a purpose—but not … for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105.

The government responded that "bills of lading should be admissible … as substantive evidence, not for a limited purpose." Then, he acknowledged that "it was initially admitted only for the purpose of the effect on the listener," but then moved for the bill of lading to be admitted into evidence without limitation.

The court explained that it did not think the bill of lading was being admitted for the truth of the matter asserted and that it did not see any reason to give an instruction. The court added, "It's not being admitted to show that this is where this shipment was going and this is who ordered the shipment to go there and the jury knows that." Thus, it seems that the court denied Hidalgo-Sanchez's proposed instruction and the government's motion to admit the bill of lading without limitation.

Later in the trial, when the government discussed the Michigan seizure of the Mercedes SUV, it explained how the

shipment was coordinated but never explicitly mentioned the bill of lading. The only mentions of the phone number used to arrange the shipment are:

- "[I]t's ultimately up to the jury to decide whether or not Mr. Hidalgo-Sanchez is, in fact, the one that coordinated the shipment of drugs from Stockton, California to Sturgis, Michigan, but there is certainly a call that details that, and that call is connected to Mr. Hidalgo-Sanchez by one of the phone numbers on the wire."

- "Both the calls, Government [exhibits] 366 and 367, are intercepted on target number (608) 404-4032, telephone with a Madison phone number that was being utilized by Pablo Hidalgo-Sanchez."

Notably, the government did not mention the information on the bill of lading in its closing.

*2. Rule 29 Motions*

At the close of the government's case, both Gomez and Hidalgo-Sanchez moved for dismissal pursuant to Federal Rule of Criminal Procedure 29(a). Gomez simply moved to dismiss, while Hidalgo-Sanchez made a more detailed argument. Hidalgo-Sanchez argued that the government's evidence was insufficient to establish that he was a party to a conspiracy to distribute controlled substances in the Eastern District of Wisconsin.

The court denied both motions because it found that the evidence the government presented, when viewed in the light most favorable to the government, was certainly sufficient to demonstrate that Gomez and Hidalgo-Sanchez had engaged

in a conspiracy with others to distribute controlled substances.

### 3. Bolstering Testimony

During his initial examination of Detective Cooper, the prosecutor elicited a significant amount of testimony about the process for obtaining and maintaining a wiretap. The pertinent exchanges are included with the analysis below.

## II. ANALYSIS

In this appeal from the convictions of two separate defendants, we will first address Hidalgo-Sanchez's arguments then proceed to Gomez's arguments.

### A. Hidalgo-Sanchez

Hidalgo-Sanchez raises three issues on appeal. First, he argues that the evidence presented at trial was insufficient as a matter of law to support his conviction for conspiracy to distribute controlled substances in the Eastern District of Wisconsin. Second, he asserts that venue is improper in that district. Third, he contends that the district court reversibly erred when it failed to give a certain limiting instruction to the jury.

### 1. Sufficiency of the Evidence

Because Hidalgo-Sanchez preserved his sufficiency-of-the-evidence argument by moving for judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of evidence, we review his claim *de novo*. *United States v. Claybrooks*, 729 F.3d 699, 704 (7th Cir. 2013). That does not mean, however, that he has an easy road ahead. In fact, he faces a "nearly insurmountable" burden. *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021) (quoting *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018)).

In sufficiency challenges to jury verdicts, "we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *Id.* (citing *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020)). "We do not make credibility determinations or reweigh the evidence … ." *United States v. Brown*, 865 F.3d 566, 570 (7th Cir. 2017). Ultimately, we "will overturn a conviction only if, after reviewing the record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Anderson*, 988 F.3d at 424 (citing *Grayson Enters., Inc.*, 950 F.3d at 405). In other words, "[i]f there is a reasonable basis in the record for the verdict, it must stand." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017) (citing *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000)).

To secure a conviction in a conspiracy prosecution, "the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Hopper*, 934 F.3d 740, 754 (7th Cir. 2019) (quoting *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010)). With respect to drug-distribution conspiracies, "[t]he government must prove beyond a reasonable doubt that the defendant knowingly agreed, perhaps implicitly, with someone else to distribute drugs." *United States v. Vizcarra-Millan*, 15 F.4th 473, 506 (7th Cir. 2021).

Evidence showing only that two people are in a buyer-seller relationship is insufficient to prove a drug-distribution conspiracy. *Hopper*, 934 F.3d at 754. The same is true if the evidence is "in equipoise"—that is, it suggests that either possibility is equally likely. *Johnson*, 592 F.3d at 755.

There are two principles that are helpful to this analysis. First, "[t]o be liable for conspiracy, a defendant must have 'a stake in the venture' and therefore exhibit[] 'informed and interested cooperation.'" *Vizcarra-Millan*, 15 F.4th at 507 (alteration in original) (quoting *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013)). Second, we require "[e]vidence of an agreement to advance *further* distribution—beyond the initial transaction." *Hopper*, 934 F.3d at 754 (alteration in original) (citing *United States v. Pulgar*, 789 F.3d 807, 812 (7th Cir. 2015)).

We have also acknowledged and employed a "nonexhaustive list of characteristics that strongly distinguish a conspiracy from a buyer-seller relationship." *Id.* at 755 (quoting *United States v. Pereira*, 783 F.3d 700, 704 (7th Cir. 2015)). Those characteristics include:

> sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities.

*Id.* (quoting *Pereira*, 783 F.3d at 704). Moreover, "if a person buys drugs in large quantities (too great for personal consumption), on a frequent basis, on credit, then an inference of conspiracy legitimately follows." *Brown*, 726 F.3d at 1002.

Despite the utility of these "rules of thumb," *Vizcarra-Millan*, 15 F.4th at 507, our ultimate charge is to "take into account all the evidence surrounding the alleged conspiracy and make a holistic assessment of whether the jury reached a reasonable verdict," *Brown*, 726 F.3d at 1002. Otherwise stated, we must

"consider the totality of the circumstances" to determine whether a conspiracy existed. *Id.*

Hidalgo-Sanchez first suggests that he was in a mere buyer-seller relationship with Gomez, not a conspiracy. To begin, we address the government's contention that Hidalgo-Sanchez waived or forfeited this argument because his trial counsel confirmed to the district court during the jury instruction conference that the evidence did not require a buyer-seller instruction. The government's contention is beside the point. The thrust of Hidalgo-Sanchez's appeal is that the evidence was insufficient to show that he was involved in the alleged conspiracy. One way for him to do that is to concede that the evidence is sufficient to prove something short of conspiracy—a buyer-seller relationship—but nothing more. Put a different way, he could have advanced this sufficiency argument without mentioning "buyer-seller" at all. He could simply have explained what was *not* proven and refrained from also conceding what *was* proven. He preserved his sufficiency challenge by moving for a judgment of acquittal under Rule 29. *Claybrooks*, 729 F.3d at 704. His earlier failure to insist on a buyer-seller jury instruction did not make that preservation impossible.

Now we turn to the evidence. As will be shown below, the evidence makes it clear that Gomez was in charge of a fairly large conspiracy to distribute heroin, cocaine, and methamphetamine in Milwaukee. He worked with coconspirators to transport these controlled substances to Milwaukee by hiding them in void spaces in cars that were then shipped via commercial car carriers. They would then hide money or drugs in the cars and send them elsewhere. Testimonial evidence, recorded calls, pole-camera footage, and in-person surveillance

confirm Gomez's role in at least three of these shipments. Intercepted phone calls also demonstrate that Gomez was in contact with two people in Mexico that the government asserts were sources of supply. Finally, in many phone calls, Gomez negotiated further drug sales to local distributors. One such distributor was Bryan Banks, who testified as to the coded language used in the recorded conversations and made clear that he was exchanging large sums of money for kilogram quantities of controlled substances.

The key question, though, is whether the evidence ties Hidalgo-Sanchez to this conspiracy. We conclude that it does—or, at least, there is a reasonable basis in the record for the jury's verdict that it does. To be clear, the evidence does not need to show that Hidalgo-Sanchez was involved in every act of the conspiracy. *United States v. Brasher*, 962 F.3d 254, 261–62 (7th Cir. 2020). It is also not necessary that Hidalgo-Sanchez knew every member of the conspiracy. *Id.* at 261. Instead, the evidence must only show that he was "aware of the aim of the conspiracy and made a knowing decision to join it." *Id.* at 262 (citing *United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002)).

Here, there is evidence that Hidalgo-Sanchez would buy drugs from Gomez on credit and consignment. A few calls illustrate this point. First, in a June 22, 2017 call, Gomez asked Hidalgo-Sanchez if he "want[s] some for thirty-one (31), lent to [him] for about three (3) days." Later in the call, Gomez explains that he "can tell them a week," but "then if they start asking and I don't have all the money, they're going to start pressuring me." By the end of the call, it's not clear whether a deal was made, but an inference can be reasonably drawn about the way Gomez and Hidalgo-Sanchez worked together.

In a February 15, 2017 call, Esquivel-Sotelo tells Hidalgo-Sanchez that there was a fake fifty-dollar bill that was part of a $600 payment that made its way from Hidalgo-Sanchez to Gomez's sister, Tita. A jury could easily infer from the call that Esquivel-Sotelo was asking Hidalgo-Sanchez to replace it with real money and that Hidalgo-Sanchez was intent on complying.

These two calls, together with Banks's testimony about the coded language the conspirators used when making deals, could lead a jury to conclude that there was a course of conduct between Gomez and Hidalgo-Sanchez that involved the extension of drugs on credit.

With respect to consignment, the key call occurred on March 8, 2017. In that call, Hidalgo-Sanchez complained that the "one" he got from Gomez was "falling apart" and "like dirt." He explained that one of his customers, a guy who "bought the quarter from [him]," did not want it. They agreed that Hidalgo-Sanchez could return the "powdery" kilogram for a "harder" one, in hopes that the customer would not reject it. The ability to return unsold drugs is the hallmark of a consignment. *See Pulgar*, 789 F.3d at 811 ("[W]hen a 'seller permits the buyer to return unsold drugs,' he stands on the precipice of a consignment sale. And consignment sales are 'quintessential evidence' of a drug-distribution conspiracy." (citation omitted) (quoting *Brown*, 726 F.3d at 999)). This call illustrates that the two had a shared stake in the further sale of the heroin and were working out a solution together.

Other than these two examples, from which it would be reasonable for a jury to infer that the two were dealing with kilogram quantities, below are examples from other calls that

suggest that Hidalgo-Sanchez acquired "large quantities" from Gomez:

- January 5, 2017: Hidalgo-Sanchez asked for a "half," but Gomez did not have any and didn't expect any for three more days.

- March 6, 2017: Hidalgo-Sanchez complained about product that was "all damp." They discussed "the other one," which fell apart "terribly."

- March 8, 2017: Hidalgo-Sanchez asked if Gomez wanted to see the "ones from Califas." He said he had "two," "one and one."

- March 21, 2017: Hidalgo-Sanchez called Gomez from a private party at a restaurant and requested a "quarter," explaining that there was a buyer waiting with "cash on hand." Gomez explained that he only had the "lo[o]se kind." Hidalgo-Sanchez changed course and asked Gomez if he could help him get "twenty five." They discussed the difficulty of obtaining that much at one time. Gomez said that he would "see how many arrive … and let [him] know how many [he] can handle." He also ventured that they could "leave five (5) down there, dude."

It would be reasonable for a jury to infer from these interactions that Hidalgo-Sanchez and Gomez dealt frequently with one another and exchanged large quantities of drugs and money. Moreover, they shared the objective of acquiring more drugs and ensuring that Hidalgo-Sanchez's customers were satisfied. They had a joint stake in the operation.

The jury could also have reasonably inferred from the evidence that Hidalgo-Sanchez arranged the transport of the

Mercedes SUV containing five kilograms of methampheta-
mine that was intercepted in Michigan. The extreme similar-
ity between this transport and the three other intercepted
transports could reasonably lead a jury to infer that they were
part of the same criminal objective. This is especially so con-
sidering that it happened in the middle of their course of deal-
ing and followed the other three transports.

Admittedly, this evidence does not necessarily entitle the
government to the "legitimate[]" inference of conspiracy that
follows from frequent transactions of large quantities of drugs
on credit. *See Brown*, 726 F.3d at 1000. Although the evidence
indicates that each of those features is present in one or more
of Gomez's and Hidalgo-Sanchez's interactions, it is not clear
that there was a consistent pattern of transactions that in-
cluded all three. We are still convinced that the jury's verdict
should not be disturbed, though, for two reasons. First, it is
possible that a jury could still reach the opposite conclusion,
and our review is very deferential to that possibility. And sec-
ond, the evidence otherwise establishes that Gomez and Hi-
dalgo-Sanchez are guilty of the charged offense.

In any event, the totality of the circumstances suggests a
relationship between the two that was much deeper and more
entwined than a mere buyer-seller relationship. First and
foremost, there is evidence that shows Gomez sold Hidalgo-
Sanchez drugs on credit and consignment. Second, there is
evidence that Gomez had an interest in the sales that Hidalgo-
Sanchez made. He allowed Hidalgo-Sanchez to replace infe-
rior product to ensure that his customers would be satisfied.

Their relationship also showed a level of trust indicative
of conspiracies. *Vizcarra-Millan*, 15 F.4th at 507 ("We have
sometimes described [the conspiracy] factors as supporting

an inference of heightened trust, but evidence of mutual trust alone is insufficient." (citing *Pulgar*, 789 F.3d at 815–16)). They openly discussed the contents and expected arrival dates of shipments of controlled substances and very likely shared tactics for trafficking them. And the jury could infer from the similarity of the four vehicle seizures that the two were carrying out the same operation, or that one "advised the other on the conduct of the other's business." *Johnson*, 592 F.3d at 755–56. This is more than enough evidence to support the jury's verdict.

*2. Venue*

Hidalgo-Sanchez also argues that the evidence was insufficient to show that venue was proper in the Eastern District of Wisconsin. We disagree. "[I]t is not at all unusual for conspiracies to cross state and judicial district lines; hence, the law recognizes that such crimes may be prosecuted in any district where one's co-conspirators have acted in furtherance of the conspiracy." *Brasher*, 962 F.3d at 263 (citations omitted). This proposition is backed by 18 U.S.C. § 3237(a), which states that "any offense … begun in one district and completed in another, or committed in more than one district, may be … prosecuted in any district in which such offense was begun, continued, or completed."

Here, the evidence shows that Hidalgo-Sanchez himself committed overt acts in the Eastern District of Wisconsin, not to mention his coconspirators, including Gomez. Three examples make the point.

First, on December 5, 2016, Hidalgo-Sanchez and Avina were intercepted speaking on the phone about drugs. Hidalgo-Sanchez asked, "Isn't there a little bit from that one?

Because this guy wants some of that one." Avina replied, "Well, … there's hardly any left … . I don't know how much you can get from that one, all that's left is dust." Hidalgo-Sanchez said, "Let me see; are you there?" Avina answered, "Yes. I'm here at my house." Detective Cooper testified that, after the call, he saw Avina and Hidalgo-Sanchez at Avina's apartment in Milwaukee. Viewed in the light most favorable to the government, this exchange shows that the two conspired to advance further drug sales in the Eastern District of Wisconsin.

The second example is the call that Hidalgo-Sanchez made from the Milwaukee restaurant to Gomez on March 21, 2017. He called Gomez to try to secure drugs for a customer who had "cash on hand." Moreover, they discussed how to obtain a huge amount of additional drugs from a supplier.

Third, on April 18, 2017, Gomez, with whom the evidence shows Hidalgo-Sanchez was conspiring, and several others prepared and loaded the silver Jetta onto a car carrier in the parking lot of a Milwaukee Wal-Mart. The Jetta was stopped in Illinois and officers found $145,380, a GPS tracker, and an audio recorder. Later, an intercepted call featured Gomez discussing the seizure of the Jetta with his sources of supply in Mexico. These were clear overt acts, occurring in the Eastern District of Wisconsin, that were central to the drug-distribution conspiracy that Hidalgo-Sanchez was a part of.

Because Hidalgo-Sanchez and his coconspirators committed acts furthering their drug-distribution conspiracy in the Eastern District of Wisconsin, venue was proper there.

*3. Limiting Instruction*

Hidalgo-Sanchez next argues that the district court erred when it twice refused to give an instruction to the jury to limit its consideration of the Michigan bill of lading to the purpose proffered by the government: that there were inconsistencies on it that prompted Officer Myers to investigate further the Mercedes SUV. When he did investigate, he found about five kilograms of methamphetamine.

We review for an abuse of discretion a district court's decision to give or refuse to give a jury instruction. *United States v. Campos*, 541 F.3d 735, 744 (7th Cir. 2008). We conclude that there was an abuse of discretion in this case when the district court refused to give a limiting instruction along the lines of what Hidalgo-Sanchez requested. That is because Federal Rule of Evidence 105 provides that "[i]f the court admits evidence that is admissible … for a purpose—but not … for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105; *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) ("A limiting instruction must be given upon request.").

Here, the district court overruled Hidalgo-Sanchez's immediate hearsay objection after the government explained that it was only offering the bill of lading to show why it "raise[d] this officer's suspicions." Then, at the jury instruction conference near the close of evidence, Hidalgo-Sanchez proposed a limiting instruction. In response, the government requested that the bill of lading be admitted without limitation. The district court explained that it did not see "any need to give the jury an instruction" because the bill of lading was "not being admitted to show that this is where this shipment

was going and this is who ordered the shipment to go there and the jury knows that." Then, it moved on, leaving undisturbed its decisions to admit the bill of lading for a limited purpose and to not give an instruction.

While we are somewhat persuaded by the reasoning of the district court that an instruction was not really necessary as a conceptual matter, that does not negate the fact that Hidalgo-Sanchez was entitled to one upon timely request. *See* Fed. R. Civ. P. 105. Therefore, we believe an abuse of discretion occurred.

Having concluded that refusing to give a limiting instruction to the jury was error, we must now decide whether it was harmless. *See* Fed. R. Crim. P. 52(a). The error was harmless if it did not affect Hidalgo-Sanchez's substantial rights. *See United States v. Robinson*, 724 F.3d 878, 888 (7th Cir. 2013). "Generally speaking, a finding of harmlessness is appropriate only if an appellate court can say 'with fair assurance' that the judgment was not 'substantially swayed by the error.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). It is the government's burden to demonstrate this. *Id.* (citations omitted).

Hidalgo-Sanchez contends that the bill of lading was a critical piece of evidence because it listed a number associated with him as the recipient's phone number. The recipient's name is listed only as "Jackson." The jury should have been instructed not to consider the truth of the matter asserted, Hidalgo-Sanchez insists. But the truth of the matter asserted is seemingly that a person named Jackson in Sturgis, Michigan, with this phone number really is the recipient of the Mercedes SUV. Just as the district court concluded, this does not advance the government's case against Hidalgo-Sanchez at all.

It is possible that the jury knew this number was associated with Hidalgo-Sanchez, and therefore that he was involved in this shipment, but the government already associated him with the shipment. It offered two intercepted calls purportedly from "Roberto Martinez" to the car carrier company, Mueve Tu Carro. The calls were made from Hidalgo-Sanchez's number and Detective Lazo identified his voice on the calls. Hidalgo-Sanchez tries to deal with this fact by suggesting that even if he were the caller, the bill of lading shows that he was the recipient, too, and that fact is somehow a linchpin in the case. But in reality, that additional inference would not materially change anything, if the jury inferred it at all.

Although the bill of lading was supposedly critical to the government's case, after it was admitted, the government never mentioned it again at trial or in closing. Additionally, while Hidalgo-Sanchez was entitled to the instruction and wanted it, the instruction would have drawn the jury's attention back to the bill of lading, when it had been all but abandoned. The linchpin argument is also undermined by the mountain of other evidence connecting Hidalgo-Sanchez to Gomez and the drug-distribution conspiracy.

As the government points out, there are cases where instruction-related errors are so prejudicial that they warrant a new trial, *see Robinson*, 724 F.3d at 891, but this case is not one of them. Here, we "can say 'with fair assurance' that the judgment was not 'substantially swayed by the error.'" *Id.* at 888 (quoting *Kotteakos*, 328 U.S. at 765). Therefore, we conclude that the district court's failure to give a limiting instruction was harmless.

*B. Gomez*

Gomez raises only one issue in his appellate brief. He argues that the government's impermissible use of bolstering testimony so tainted his trial that a new one is warranted. The relevant testimony was elicited from Detective Cooper, and appears below:

> Q. Okay. And so you make the determination that you're going to get—you'd like to get a wiretap. How does that process begin?
>
> A. So the wiretap's kind of a last resort because it's a lot of work, so the process begins through the controlled buys that we've talked about through surveillance, through a lot of analysis of phone records and viewing who people are calling and—and trying to identify who they're talking to. Eventually we take all of that information and compile an affidavit which lays out our investigation to that point and the—the reasons we believe that a wiretap's necessary.
>
> Q. Okay. And is that a small affidavit, big affidavit? About roughly what's the average size?
>
> A. I believe the goal is approximately 50 pages, but generally they're a little longer than that.
>
> Q. Okay. And so you began to, I take it, you began drafting an affidavit?
>
> A. Yes.
>
> Q. And you did that in consultation with the prosecutor's office?
>
> A. Yes.

Q. Okay. And is that the D.A.'s Office or the U.S. Attorney's Office?

A. The U.S. Attorney's Office.

….

Q. Okay. And so you indicated that a lot of the information goes into the affidavit including an analysis of phone records and other documents. Do you know what a pen register is?

A. Yes.

….

Q. Okay. Once you draft your affidavit for a wiretap, do you submit it to the U.S. Attorney's Office?

A. Yes.

Q. And then the U.S. Attorney's Office has an internal approval process?

A. Right.

Q. And then that affidavit gets sent off to another—to be reviewed again?

A. Yes, it does.

Q. And ultimately that affidavit has to be approved from an official in main justice?

A. Yes.

Q. After that is done, the affidavit that you drafted, does that get submitted to a judge?

A. It does, yes.

Q. Okay. And that's a federal judge?

A. Yes.

Q. And that affidavit is submitted for review along with an order to allow you to wiretap?

A. Correct.

….

Q. And that was submitted to a federal judge?

A. It was.

Q. And a federal judge signed off for court approval for a wiretap in that case?

A. Yes.

….

Q. And as part of your commitment to getting the wiretap—Let me back you up.

When you get a wiretap authorized, that gets signed by a federal judge?

A. Yes, it does.

Q. And in authorizing the wiretap the federal judge makes some requirements of the agents, correct?

A. Yes.

Q. And one of the requirements is an ongoing requirement to—to, for the sake of a better word, update the court?

A. Yes.

Q. So approximately how many—During the course of a wiretap, you're required to give updates to the court?

A. Yes, every 10 days.

Q. Okay. So every 10 days do you generate a report?

A. Yes.

Q. And that report documents whether—Well, what's in that report generally?

A. It documents kind of the status of the investigation, that says what—when did the wiretap go up on that phone, if it's still up. It documents the number of calls that have come in and then the number of—those that are pertinent or non-pertinent, the number that have been minimized or were privileged. It discusses whether there were errors of the monitoring system which might've caused us to not hear—or for calls not to come into our system.

Q. So part of the review process is you got to basically every 10 days let the Court know that the machines are working right, right?

A. Right.

Because Gomez did not object to this testimony, our review is for plain error only. *See United States v. McMahan*, 495 F.3d 410, 418 (7th Cir. 2007), *vacated in part on other grounds sub nom. United States v. Smith*, 552 U.S. 1091 (2008). To prevail under this standard, Gomez "must show (1) error, (2) that is plain, (3) that 'affects substantial rights,' and (4) that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (alteration in original) (quoting *United States v. Gray*, 410 F.3d 338, 345 (7th Cir. 2005)).

Here, the government concedes that there was error and that it was plain. Still, we pause for a moment to discuss why that is. We explained in *United States v. Cunningham* that testimony regarding the many layers of approval by officials at

various levels of government required to obtain a wiretap is "wholly unrelated to the defendants' guilt or innocence—and not necessary to be established to prove the case against the defendants." 462 F.3d 708, 712 (7th Cir. 2006) (citing Fed. R. Evid. 401 (definition of relevance); and then Fed. R. Evid. 402 (irrelevant evidence inadmissible)). We summarized our decision in *Cunningham* in the following way:

> Over the defendants' objection at trial, the government recounted a litany of procedures [that] the local U.S. Attorney's office, the Office of the Attorney General, and the Drug Enforcement Administration … utilized in seeking court authorization for two telephone wiretaps. In doing so, the government witness's testimony suggested to the jury that a panel of senior government lawyers in the Office of the Attorney General in Washington, D.C. and others in law enforcement were of the opinion that there was probable cause to believe the defendants were indeed engaging in criminal activity. The admission of this irrelevant evidence had the effect of improperly bolstering the credibility of the government's case in the eyes of the jury, and the error was not harmless.

*Id.* at 709–10.

The following year, we passed on the same issue again but reached a different, but consistent result. In *United States v. McMahan*, the government impermissibly used bolstering testimony at trial, but defense counsel did not object. Therefore, we reviewed for plain error. 495 F.3d at 418. We found that there was error and it was plain, but that it had not affected McMahan's substantial rights or seriously affected the fairness, integrity or public reputation of judicial proceedings because "evidence of the defendants' criminal activity was

substantial"; "none of the evidence came from the affidavits filed in support of the wiretap applications"; and "[t]here was no further reference to [the bolstering] testimony." *Id.*

Regarding Gomez's substantial rights, we reach the same conclusion—they were not affected by the error, primarily because the evidence against Gomez was truly overwhelming. That is, we "can say 'with fair assurance' that the judgment was not 'substantially swayed by the error.'" *Robinson*, 724 F.3d at 888 (quoting *Kotteakos*, 328 U.S. at 765; *see also Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) ("[T]here must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018))).

The evidence at trial convincingly demonstrated that Gomez was central to the drug-distribution conspiracy. He was recorded on numerous phone calls discussing when shipments would arrive and what drugs they would contain. He was recorded answering questions and giving instructions to coconspirators. He was captured on pole-camera footage and by in-person surveillance preparing cars for transport and overseeing the loading of the cars onto carriers. He was recorded speaking with two people in Mexico about the seizures of vehicles across the country containing cash and drugs. And he was often responsible for ensuring that customers were satisfied by the drugs that he provided to middlemen, like Hidalgo-Sanchez. When they were not, he would work with the middlemen to replace them with higher quality drugs. Finally, Banks testified about specific interactions with Gomez, deal terms, and the coded language that they would use. In fact, the evidence is so substantial in this case that we do not even account for all of it in this opinion.

Though Gomez failed to meet his burden on the third prong of the plain error test, dooming his appeal, we also note that he fails on the fourth prong. Despite his assertion that using the bolstering evidence "was an intentional effort to 'back door' the jury and infect 'the fairness and integrity,' not only of [his] trial, but of justice itself," there is no evidence of nefarious intent here. (Appellant's Br. at 19.) Considering the strength of the case and the absence of evidence on intent, we cannot say that a "miscarriage of justice" occurred. *United States v. Maez*, 960 F.3d 949, 962 (7th Cir. 2020) (explaining that a "miscarriage of justice" is akin to "a substantial risk of convicting an innocent person" (quoting *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005))).

Although we find here, as in *McMahan*, that there was no plain error, we are disturbed that the government continues to use bolstering evidence in criminal trials. Fifteen years have now passed since *Cunningham* and *McMahan*, yet it still happens.

Although Gomez had no proof that the government deliberately skirted our rule in this case, we certainly see the potential for prosecutors to evaluate the risk and reward of bolstering their weak cases with this type of impermissible testimony. If defense counsel objects, then the government might have to try the case again if the trial or appeals court determines the error was not harmless. But if the defense does not object, then perhaps the government could secure a conviction by prejudicing the jury, and then evade any consequence because of the deferential plain error standard on appeal.

During oral argument, our concern led us to order the government to submit a supplemental response addressing cases from other circuits regarding the continued introduction of

bolstering testimony like the kind at issue here. We asked the government to include any case in which the appellate court declined to apply the plain-error standard as a remedial tactic. The government was able to find only a few cases, and none declining to apply the plain-error standard. And in the end, we determined that we were bound to continue to employ that standard here.

In closing, we want to be very clear: the use of bolstering testimony of the nature used in this case is impermissible and it has the potential to damage our criminal courts whenever it is used. The responsibility for avoiding this falls squarely on the government. At the very least, the government should ensure that its training materials reflect the seriousness of avoiding this type of conduct. It must also do whatever else is necessary to ensure this does not happen again.

Finally, we impart upon the defense bar the importance of objecting immediately to the use of this type of testimony. While it was not the only difference between *Cunningham* and *McMahan*, it was a critical difference. As all criminal law attorneys are surely aware, plain error review is, by design, a much harder path to reversal than review for harmless error.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the convictions of both Gomez and Hidalgo-Sanchez.